Thomas F. Pickham, Appellee, v. Illinois, Iowa & Minnesota Railway Company, Appellant.

Gen. No. 14,903.

1. EVIDENCE—*incompetency of conclusion.*   Nothing is more erroneous and dangerous than to permit a witness to determine the law upon questions involved in a case on trial, through failure to require the witness to testify to facts instead of giving his conclusions involving propositions of law as well as of fact.

2. ASSUMPSIT—*when account stated arises.* When a rendered statement of an account has been retained, without objection to the account or to the items contained therein, for such a length of time that the recipient has had a reasonable time within which to express objections, then he is in law regarded as having waived his objections, if any he had. Thereafter, if an action as upon an account stated be brought upon the claim, the original character or form of the debt, as well as what kind of evidence was necessary to establish the same, is unimportant.

3. ASSUMPSIT—*what does not affect employment of account stated.* An account which becomes stated by virtue of retention without objection is none the less so because of the omission by mistake of an item which should have been included.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Affirmed. Opinion filed March 18, 1910.

HENRY C. WOOD and STEERE, WILLIAMS & STEERE, for appellant.

ELMER E. LEDBETTER and WILLIAM R. T. EWEN, Jr., for appellee.

MR. PRESIDING JUSTICE CHYTRAUS delivered the opinion of the court.

Plaintiff obtained a verdict and recovered a judgment for $2,500 in the Superior Court against the defendant railway company in an action of *assumpsit.* The company prosecutes this appeal. The plaintiff makes claim under an original and an additional contract, for repairs made upon a locomotive and for extra work, labor and material ordered from time to time by representatives of the company, during the progress of the repairs, as necessity for extras was discovered.

The parties litigant were first brought together through a communication to plaintiff's shop, by William T. McSwiney, treasurer of defendant, that he desired to see some one who would figure upon the cost of repairing a locomotive for the company. In response

Pickham v. Illinois, Iowa & M. Ry. Co., 153 Ill. App. 281.

plaintiff called upon McSwiney at the company's office in Chicago.    After a talk with McSwiney plaintiff went to DeKalb, Illinois, at McSwiney's request, to see the locomotive.   At DeKalb plaintiff spent about an hour looking over the locomotive and there he met John T. Duffin, general superintendent for the defendant, who had general charge of superintending construction and of the rolling stock.   Duffin testified that he informed plaintiff of the general condition of the engine, that he told him the company desired it repaired quickly and wanted the locomotive "put in thorough first-class shape."   He also testified that he authorized McSwiney to make the contract, but that he did not think that he, himself, had anything to do with the making of it.   Plaintiff sent a proposition to the superintendent for the making of the repairs, and, subsequently, took up the matter with McSwiney.   A contract for repairs upon the locomotive was then made, between McSwiney, who acted for the company, and plaintiff, in the form of two letters, as follows:

"December 24th, 1904.
Illinois, Iowa and Minnesota Ry. Co.,
    Gentlemen:
    I propose to take out the fire-box in your No. 10 engine and replace it with a new one of the same design and dimensions; also cut off holes now on leg of outside plates and set the ring up high enough to get the defective parts of plate out; take out entire set of flues; weld new ends on and replace them in the boiler. This will place the boiler in first-class condition for the sum of Twelve Hundred and Fifty Dollars ($1,250.00).
    I also propose to weld the engine frame, replace all the parts broken or missing and give the entire engine a thorough overhauling, leaving the same in good running order, for the sum of Four Hundred and Fifty ($450.00) Dollars. You will deliver the engine to me on the Burlington tracks, Chicago, and I will have the

same ready for you six weeks after you make this delivery.

Respectfully submitted,

(Signed)    Thomas F. Pickham.

Engine to be delivered to
inspection before delivery.

"December 24th, 1904.

Mr. Thomas F. Pickham,
    Chicago, Ill.
Dear Sir:—

Replying to your letter of the 24th instant, we will accept your proposition for repairs to our engine No. 10, with the proviso that you make delivery within six weeks after the engine is delivered to you, and for each day's delay after said period of six weeks you will incur a penalty of $10.00, the same to be deducted from any money coming to you. If, on the other hand, you get the engine completed earlier than six weeks from date of delivery to you, we will give you $10.00 a day premium for each day of such earlier delivery. The engine to be guaranteed in first-class running order and the material and workmanship to be subject to the approval of an inspector appointed by us.        Yours truly,

(Signed)    W. F. McSwiney,
            Treasurer.   Mc-S."

On January 3, 1905, the locomotive was delivered to plaintiff. After starting his work plaintiff discovered that the flues of the locomotive were in such poor and worn out condition that new ones were advisable. Of this condition plaintiff then informed McSwiney. Some negotiation took place during which plaintiff asked $200 additional for putting in new flues. The company, however, refused to pay that much and procured plaintiff's agreement to put in the new flues for $100 and an additional agreement was then entered into in the form of two letters as follows:

"February 6, 1905.

Illinois, Iowa and Minnesota Ry. Co.,
    369 The Rookery, City.
Gentlemen:  In reference to the flues that we have

taken out of your locomotive boiler, we find that they have been re-ended two different times, and the center of the flues are in such condition that it will never do to put them back in the boiler again. We wish you would send a representative to our factory so we can show him same.

It will be necessary to put in new flues, as these flues, when welded and placed back in the boiler again as contemplated, would last but a short time. The additional cost of putting in new flues instead of the old ones will be something like Three Hundred ($300.00) Dollars. Rather than make an unsatisfactory job with the old ones, we will use the new ones and make a charge to you of One Hundred Seventy-five ($175) Dollars. We know that you would rather make this additional expenditure and do the job this way. We also are putting on an entire new bottom on the outside of the boiler at the water leg, as it is necessary so as to put the job in a complete condition, and for this we won't make any charge.

If you agree with our views in this matter, we would prefer that you send somebody up here to look at the tubes and to satisfy yourself that our statement is correct.

Yours truly,<br>(Signed) Thomas F. Pickham.<br>M."

"Feb. 10th, 1905.

Mr. Thomas F. Pickham,
   53 West 14th Place,
     Chicago, Ill.

Dear Sir:—

Replying to your letter of the 6th instant, and confirming arrangement made with you by Mr. Duffin, we will increase the amount agreed upon with you for the repair of our locomotive No. 10 from $1,700.00 to $1,800.00. In consideration for this increased sum you are to put in a complete set of new flues and turn out the engine in first-class condition all around.

Please advise when boiler is ready for inspection

and we will arrange for inspection by a Hunt In-
spector.

Yours truly,
(Signed)   W. F. McSwiney,
Treasurer.''

Both parties obviously regarded the defective con-
dition of the flues as something which was not discov-
ered and which perhaps could not have been dis-
covered at the DeKalb inspection of the locomotive,
and of which plaintiff was not then informed; for,
without dispute, so far as the record shows, both par-
ties by their action construed the original contract
not to require plaintiff to repair the defective flues,
except upon payment of further compensation. Both
acted upon the theory that the scope of the contract
they had first made did not include or require that
the plaintiff should make repairs of after-discovered
defects and worn out parts and conditions.

As the parties have themselves interpreted their
contract in this respect, it is, perhaps, unnecessary
for us to express any opinion regarding the correct-
ness of that interpretation or to say anything upon
that subject. But as this is the only proposition, so
far as the merits of this controversy are concerned,
whereupon, in the absence of an interpretation of the
contract by the parties themselves, there would have
been room even for discussion, we will say that the
parties were undoubtedly correct in their interpreta-
tion. Plaintiff's letter of December 24, 1904, was
based only upon his knowledge of the locomotive's
condition derived from defendant's superintendent's
statement and about an hour's personal inspection.
This short inspection of the locomotive, while, per-
haps, talking with the superintendent, could be but
external and very superficial. Many defects could
exist of which plaintiff could not become aware and
which he, therefore, as the parties well knew, would
not have in contemplation in arriving at the price to

which he agreed.  Furthermore, although plaintiff's letter, after specifying certain things to be done, concludes with the language "and give the entire engine a thorough overhauling, leaving the same in good running order," the specification, nevertheless, excludes the idea that plaintiff agreed to repair all after-discovered defects.  A different interpretation might have required plaintiff to rebuild the entire locomotive, if sufficient latent defects and worn out places were subsequently discovered.  The parties were but reasonable in the construction they put upon the contract.

It appears that the matter of new flues occasioned some considerable delay.  Plaintiff informed the company in advance that to obtain the new flues would cause some delay, because flues of that particular length were not kept in store.  The flues were finally obtained, some time in the latter part of March, from an iron company in Pittsburgh, which was the only place where these flues could be obtained.

In the middle of February, or about a week after the question concerning the flues came up, it was discovered that certain plates inside of the locomotive were worn down.  Plaintiff and his brother then called upon McSwiney and informed him of the condition of these plates and suggested that new ones be substituted because, as they told him, new plates would have to be put in in two or three years, at all events, and then at a cost two or three times greater.  The cost of the additional work, plaintiff informed McSwiney, would be at the rate of sixty cents an hour.  After some discussion McSwiney told plaintiff to go ahead with this additional work.  The officers of the company appear to have concluded about this time that with some change the locomotive could be made use of for a better or higher grade of work than it had formerly been used for, that is, that it might be used for service on passenger trains.  Consequently a letter was sent to plaintiff on March 6, 1905, as follows:

"KENEFICK CONSTRUCTION COMPANY,
369 The Rookery,
Chicago, March 6th, 1905.

Mr. Thomas F. Pickham,
53 West 14th Place,
Chicago.

Dear Sir:—

Regarding the repairs which you are doing on Loco. 10 for this Co. it appears to me that there was no pilot on same only a switching step. If this was so I herewith authorize you to put a pilot on. I also authorize you to put on the Loco. an Air Signal Connection, as she is to be used on Passenger Train. An allowance will be made you for thè said additional repairs.

As we are in need of the Loco. I shall thank you to rush the repair to completion, as the time allowed for same is run over.

Yours truly,
W. F. McSwiney."

From time to time, while the work was being done, plaintiff talked with McSwiney about "these little parts," that is, other defects which were discovered, and McSwiney, as plaintiff testified, questioned him as to whether or not they were necessary to be done. This questioning was undoubtedly both on account of the additional cost and on account of the additional length of time the repairing would take. Plaintiff finally told McSwiney, "The proper thing for you to do is to send up a man to represent your company, that has power enough to order this work if we run into it." Some time thereafter one Shillinglaw brought to plaintiff a letter as follows:

"KENEFICK CONSTRUCTION COMPANY,
369 The Rookery,
Chicago.
March 16, 1905.

Thomas F. Pickham,
Canal and 14th Place, City.

Dear Sir:—

This will be handed to you by our inspector, T. O. Shillinglaw, who desires to look over the engine now

Pickham v. Illinois, Iowa & M. Ry. Co., 153 Ill. App. 281.

in your works. Will you kindly afford him every
facility for so doing?

Yours truly,

W. F. McSwiney,

Mc-S.                                    Treasurer.''

There is some conflict in the evidence as to whether
Shillinglaw was or was not defendant's master me-
chanic and whether he was represented to plaintiff to
be such. It is quite clear that he was not defendant's
master mechanic; but this conflict is wholly immaterial
for there is no dispute as to Shillinglaw representing
the defendant in some capacity. McSwiney testified
that he went there to ''oversee'' the work. In the
letter he brought to plaintiff the company called him
''our inspector.'' Shillinglaw remained at plaintiff's
shop overseeing and inspecting the repairing of the
locomotive, from the middle of March until the work
was completed on the first of May, except that he
was away for possibly one week's time. Plaintiff
testified that Shillinglaw found something worn,
directly over the carriage of the engine, immediately
after he came to plaintiff's shop. This worn part he
directed plaintiff to take off. Plaintiff objected to
proceeding on Shillinglaw's order, only, and said:
''Hadn't we better go down and have a talk with
Mr. McSwiney and get right on the matter first? It
may be all right, but I would rather talk to Mr. Mc-
Swiney about it.'' So plaintiff, his brother and Shil-
linglaw called on McSwiney and Shillinglaw explained
to him the condition Shillinglaw had discovered and
stated that the part then in question might or might
not do, but that renewing it then would save money
for the company. He also explained that plaintiff
and his brother came with him to ascertain whether
he had authority to order the work or not. Plaintiff
at the same time interposed saying: ''Well, am I to
understand that any work he [Shillinglaw] orders us
to do, that will come up again, that we won't have to
come down here about it—that we are to go ahead and
do anything he says to do?'' To this question of the

plaintiff McSwiney replied affirmatively. Plaintiff
testified that on this occasion McSwiney acceded to
the price of sixty cents an hour for the extra work at
that time and that "Shillinglaw says he would be on
the job himself and there wouldn't be any more hours
charged than was absolutely necessary on it." Plaint-
iff's brother corroborates him in respect to this inter-
view with McSwiney and no one testified otherwise.
Shillinglaw did not testify and McSwiney testified he
had no recollection as to Shillinglaw and the Pick-
hams ever coming to see him. Plaintiff testified that
all the work done after March 6, 1905, was for the pur-
pose of making the locomotive serviceable as a passen-
ger locomotive, and this was disputed by no one. A
number of the items charged as extras are shown to
have been directed to be made by Shillinglaw. All
these extras, in addition to the work required by the
original contract, unquestionably took time and caused
delay.

On May 2, 1905, the locomotive was returned to de-
fendant repaired. Plaintiff then received from Shil-
linglaw an acceptance thereof, as follows:

"Chicago, May 1st, 1905.
Mr. Thomas F. Pickham,
53-55 West 14th Place, City.
Dear Sir:—
We hereby accept the engine and boiler as complete
in workmanship.
T. Shillinglaw, M. N.
I. I. M."

That the work and labor done and materials fur-
nished after the middle of February, charged for as
extras, were actually done and furnished is not dis-
puted. But defendant's counsel contend that these
items of extras, except the putting on of the pilot and
the signal connection, were not ordered; and, further,
that, should it be deemed they were ordered or
directed to be done by Shillinglaw or McSwiney, such
ordering or direction was without proper authoriza-
tion, because Duffin was the only one who possessed

the power of obligating defendant for such extras.
The force and effect, in this connection, of the fact
that McSwiney made the original and additional con-
tracts and executed and delivered those contracts on
behalf of defendant, counsel seek to meet and over-
come by referring to Duffin's testimony that Mc-
Swiney did so by special authority from him, Duffin.
It nowhere appears that plaintiff was informed that
McSwiney's authority in respect to ordering repairs
for the locomotive was special and limited. Plaintiff
acted, as he had a right to act, upon appearances. We
are of opinion that McSwiney was held out to him as
possessing full and complete authority in regard to
ordering repairs for this locomotive and we regard
the defendant as bound for all extras that McSwiney
authorized. McSwiney sent Shillinglaw to plaintiff's
shop and the evidence also shows McSwiney author-
ized him to order extras. Plaintiff talked with Mc-
Swiney relative to charging sixty cents an hour for
extras and McSwiney consented to this charge. Shil-
linglaw was sent to plaintiff's shop by defendant ex-
pressly to oversee and inspect the repairing of the
locomotive by plaintiff. Not only was Shillinglaw,
defendant's representative, present observing the fur-
nishing of the extras and the doing of the extra work
upon the locomotive, but in many instances he ordered
the extras. More than that, after the repairing of the
locomotive was completed he O. K.'d all plaintiff's
bills, including the bills for the extras. Although
plaintiff, after sending in his bills, called four or five
times to obtain payment of the bills, nothing was said
to him, so far as the record shows, to indicate that
the extras were not authorized nor was any complaint
made regarding any of the items or the prices charged.
It is true that once—the exact time does not appear,
but it was about the time the bills were rendered—
McSwiney called plaintiff's attention to the penalty
provision in the original contract and the benefit of
that provision was claimed for defendant, but that

was a matter entirely different and distinct from the question of authorization or prices. What McSwiney then said did not amount to disputing the authorization of the extras or the prices charged. We see no merit in the claim that the extras were not authorized as it clearly appears both that they were authorized and that they were authorized as extras. It is true that McSwiney when asked by leading questions, two or three times, whether he "authorized" any extra repairs, answered that he did not. However, those questions were not only incompetent, because calling for conclusions and conclusions of law at that (Re Estate of George C. Benton, deceased, *ante*, p. 56), but witness' answers were of little or no weight for the purpose of overcoming specific facts testified to by other witnesses. "A witness can only testify to facts, not inferences deducible from facts." Steamboat Albatross v. Wayne, 16 Ohio, 513. Nothing could be more erroneous and dangerous than to permit a witness to determine the law upon questions involved in a case on trial, through failure to require the witness to testify to facts instead of giving his conclusions involving propositions of law as well as of fact.

Defendant's counsel contend, also, that the evidence fails to show the reasonable value or worth of the extras, that there is a variance between the proof and the averments of the first and second counts and that plaintiff is not entitled to recover upon the theory of an account stated. These contentions will be considered together. The contention of lack of evidence as to reasonable worth and value is first made in this court and, therefore, comes too late. However, considering the facts of this case, we can see no reason why the plaintiff should have introduced any evidence upon that subject. The plaintiff's case was tried upon the theory of an account stated and the evidence being sufficient to establish an account stated, there was no occasion to introduce evidence of the reasonable worth and value of the items in the account. The

plaintiff's claim is for $1,800 upon the original and additional contracts and for $1,790.59 for extras. Both of these claims were recoverable under the common counts contained in the declaration. The work under the original and additional contracts, aggregating the $1,800, was done and completed. Indeed, as to that there is no dispute. The testimony of Duffin, concerning the condition of the locomotive when it was returned by plaintiff, that "We had to put her in shape and spent about three or four hundred dollars in putting her in shape," is altogether too meagre, vague, uncertain and indefinite to be entitled to any consideration whatever. The amount of $1,790.59 for extras was, of course, recoverable under the common counts, if recoverable at all, either by showing the reasonable worth and value of the items or by inclusion of the items of extras in an account stated. It follows from what has been said that there is no merit in the contention as to lack of evidence of reasonable worth and value or in the contention of variance as between the first and second counts and the proof.

On May 31, 1905, plaintiff sent his statement of account, that is all his bills, including bills for the extras, to McSwiney, together with a letter as follows:

THOMAS F. PICKHAM,
Manufacturer of Boilers, Marine, Land and Water, Air and Gas Tanks.
Office and Works, 53-55 West 14th Place.
Chicago, May 31, 1905.
Illinois, Iowa & Minnesota Ry. Co.,
The Rookery, City.
Gentlemen: Enclosed please find bills for work done on your engine. I send these that you may see the amount of extras I performed above my contract, which was to place in new firebox and set of flues and spend Four Hundred Dollars ($400) on engine. Will you please have your superintendent check same off and see that this work was done, and give me as much

credit in settlement for this extra—offset by delay forfeit?

Kindly have your Mr. Duffin look this over carefully and upon notice from you I can go over the same and settle the matter.

Yours very truly,<br>Thomas F. Pickham."

McSwiney admitted receiving the bills and the letter on that date. As already stated, plaintiff subsequently called four or five times in endeavoring to obtain payment. Plaintiff appears, from the evidence, to have been in some stress for money and about the time the bills were first presented expressed a willingness to deduct a hundred dollars or so, in satisfaction of the penalty provision in the original contract, if he could obtain immediate payment of his bills. Within a few days after the locomotive was returned plaintiff received $1,000 in two payments of $750 and $250, concerning which there is no dispute. Although he both called and sent in his statement, as has already been stated, plaintiff received no money after he sent in his statement. Neither did the defendant company inform him that there was any objection to the bills. Impatient at the delay he, in August, 1905, sent the company two letters as follows:

"Chicago, Aug. 9, 1905.

Mr. McSwiney,
    I., I & M. Ry. Co.,
        Rookery, City.
Dear Sir:—

As per our conversation, I understand you to say you will write your Mr. Duffin in regard to the settlement of my bill, and pay me for all the extra work I have done above the contract and deduct the proper amount of forfeit money.

I would appreciate having you settle this thing up

at once as I certainly cannot afford to lose this money after all this work.

Trusting you will make no further delay in settling the affair, I am,

Yours very truly,

Thomas F. Pickham."

"Chicago, Aug. 18th, 1905.

Ill. Iowa & Minn Ry. Co.,

The Rookery, City.

Gentlemen:—

On Aug. 9 I wrote you a letter about our agreement to settle the bill for labor on engine wherein you were to charge me for forfeit money and allow me for the extra work on engine and water tender. I have not heard from you since in reference to the matter, and I am unable to continue carrying this thing on, as I simply must have the money, and do not see why you cannot settle it up at once.

Kindly make an effort specially to settle this up at once, or I will have to put the thing in the hands of my attorney as it is a matter of compulsion on my part.

Yours very truly,

Thomas F. Pickham.

Mr. McSwiney, Mgr."

Thereupon the defendant, for the first time, by a letter dated August 25, 1905, makes objection to the charges for the extras. That letter is as follows:

"KENEFICK CONSTRUCTION COMPANY,

369 The Rookery.

Chicago, August 25, 1905.

Thomas F. Pickham,

53-55 West 14th Place,

Chicago, Ill.

Dear Sir:—

Replying to your letter of the 18th instant with regard to work on our engine No. 10.

I beg to advise you that upon looking over your bills for extras, we are unable to find any items which do not come under that clause of the contract which required you to 'give the engine a thorough overhauling, leaving the same in good running order.'

Under the penalty clause of contract there is due

from you $730.00, being 73 days at the rate of $10.00 a day, and in addition, we have paid out on your account for material, &c., $227.97; we have also paid you on account of this work $1,000.00 making a total debit against you of $1,957.97, and as the contract price was $1,800.00 there is due us from you $157.97, which amount we will be pleased to have you remit at once.
Yours truly,

W. F. McSwiney,
Treasurer."

In that letter there is no complaint that any of the items of extras shown in the statement sent on May 31, 1905, were not furnished, nor is there any complaint as to the prices charged for any of the items. The only objection to the extras made in the letter is that they come under the clause in the contract which required plaintiff to "give the engine a thorough overhauling, leaving the same in good running order." We have already seen that this objection is entirely without merit. At no time, up to this point, had there been any refusal by the defendant to pay; there had been only postponements.

"When a rendered statement of an account has been retained, without objection to the account or to the items contained therein, for such a length of time that the recipient has had a reasonable time within which to express objections, then he is in law regarded as having waived his objections, if any he had. Thereafter, if an action as upon an account stated be brought upon the claim, the original character or form of the debt, as well as what kind of evidence was necessary to establish the same, is unimportant." Rudolph Wurlitzer Company v. Dickinson, *ante*, p. 36. This is a wholesome rule which, among others, has the merit of tending to prevent a debtor from unnecessarily and vexatiously delaying payment of a just debt. When parties are located in the same city, as for instance here in Chicago, where they can readily communicate with each other, the time required for an account rendered to ripen into an account stated is comparatively short. In the case now before us and under the cir-

cumstances therein, the time, from May 31, 1905, to August 25 the same year, was more than sufficient to give the defendant the opportunity to examine the statement in question and to inform the plaintiff of the objections thereto, if any there were. Certainly the only objection which was finally offered, namely, that the item of extras were covered by the written contract, could and should have been made long before it was made. We are of the opinion that there was an account stated between the parties, owing to defendant's unreasonable delay of nearly three months before making any objection to the statement rendered.

King v. Machesney, 88 Ill. App. 343, and Peterson & Co. v. Wachowski, 86 Ill. App. 661, are cited to the effect that an account stated arises only upon an agreement between the parties and requires that there be an agreed balance. That is true, with the qualification, however, that the agreement may be either an express or an implied agreement. That is, the agreement may arise from a failure of a party to speak when he should speak. There is nothing in the cited cases to the contrary. Upon the facts, those cases are not in point.

There has been no dispute, at any time, as to the payment of the $1000. It was by mistake omitted from the statement plaintiff rendered. It is now argued that because of the omission that statement could not become and cannot be regarded as an account stated. An account stated is none the less an account stated because of an omission by mistake. We are not impressed by this argument. In this connection we must point out that in the brief filed defendant's counsel purport to quote, in support of their argument, from Thomlinson v. Earnshaw, 14 Ill. App. 593. We find no language in that case such as that quoted to us by counsel. We regard this as a mistake or oversight, but such mistakes, by counsel, are serious and should not occur in an argument to the court. In the case cited, although there were numerous credits, statements or memoranda had been presented showing only debits. Such being the situation the court said: "The fact

that the defendants made no objection to the several statements is perhaps evidence of an implied admission of their correctness; but this only furnishes proof of the items composing the debit side of the account.''

We regard the evidence in the case at bar amply sufficient to warrant the jury in finding an account stated between the parties, and that plaintiff, by mistake, omitted the credit of $1000. This mistake was corrected by deduction of that sum from the statement amount and the return of a verdict accordingly.

By the letter of August 25, 1905, defendant also made claim of a penalty of ten dollars per day for delay by plaintiff, beyond the time fixed by the original contract. Upon the state of facts disclosed by the evidence, we see no reason whatever why defendant should be permitted to impose a penalty upon the plaintiff for delay. The additional contract and the extras occasioned delay wholly attributable to defendant. We find no evidence whereby any of the delay is separated or segregated and shown to be attributable to the plaintiff. Under such circumstances there is a failure of such proof as would permit of charging the plaintiff with any contract penalty under the original contract.

No reason having been shown for the reversal of the judgment of the trial court, that judgment must be affirmed.

*Affirmed.*