## E. I. DU PONT DE NEMOURS & CO. v. CUDD.

### No. 3860.

United States Court of Appeals
Tenth Circuit.

Sept. 8, 1949.

Byron R. White and Donald S. Stubbs, Denver, Colo. (Lewis, Grant, Newton, Davis & Henry, Denver, Colo., Peter B. Collins, Wilmington, Del., on the brief), for appellant.

Margaret R. Bates, Denver, Colo. (January & Yegge, Ronald V. Yegge, Denver, Colo., on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, United States Circuit Judges.

HUXMAN, Circuit Judge.

Appellee, Arnold Cudd, instituted this action against appellant, E. I. du Pont de Nemours and Company, herein called Du Pont, in the District Court of Denver County, Colorado. Diversity of citizenship and jurisdictional amount being present, the case was removed to the United States District Court for Colorado. The complaint alleged that Du Pont "negligently, carelessly, and recklessly caused an explosion of a charge of nitroglycerin; and as a result of said negligence, carelessness and recklessness on the part of the defendant and said explosion, plaintiff was injured." Defendant's answer traversed the allegation of negligence and affirmatively alleged contributory negligence and assumption of risk. At the close of plaintiff's evidence and again at the close of all the evidence, defendant moved for a directed verdict. The trial court reserved its ruling on both motions and permitted the case to go to the jury under instructions which included a usual instruction requiring a finding of negligence if defendant was to be held liable. The jury returned a verdict for plaintiff, the court entered judgment thereon, and this appeal followed.

The undisputed facts show that in order to increase the production of its Levison Well Number 6 at Artesia, Colorado, Phillips Petroleum Company decided to shoot the producing formation in the well with nitroglycerin. In accordance with the usual practices, Phillips employed the T. C. S. Drilling Company, an independent contractor, to ready the well for shooting operation by "killing" it and otherwise preparing it for the laying of the shot. Du Pont was employed thereafter to shoot the well. Its activities were confined solely to that operation. Three Du Pont men came upon the premises about 3:30 P.M., September 6, 1946, for the purpose of performing this operation. Phillips' superintendent, J. W. Hilliard, specified liquid nitroglycerin as the explosive, and specified the safety devices to be used in connection therewith. Du Pont's employees, after their arrival, were advised that the well was in condition to shoot. After making precautionary tests to determine the measurements and conditions of the well, they proceeded by usual and recognized methods to lower 645 quarts of liquid nitroglycerin into the hole. Detonating time bombs were set to discharge the nitroglycerin twenty hours later, or around four o'clock the next afternoon. A protective umbrella was lowered into the hole and placed directly over the shot for the purpose of forming a screen over the explosive just below. Du Pont's men then placed a

ten foot wall of broken brick on top of the umbrella, the purpose of which was to provide a base to support the sealing cement that was to be placed thereon. The purpose of this cement was to prevent the dissipation of the force of the explosion upward. At no time did Du Pont employees make checks of the bottom-hole temperature or pressure of the well.

Halliburton Oil Well Cementing Company was employed to cal-seal the well. Appellee, an employee of T. C. S. Drilling Company, reported for work at the well about midnight, just before Du Pont left the premises. He was directed by his superior to help Mr. Linss, an employee of Halliburton, with the cal-sealing operations. The well was full of dead oil which had remained in the hole after the "killing" process and the employees were having difficulty lowering the empty dump bailers into the fluid filled hole. They were working on a wooden platform around the mouth of the well about fifteen feet above the ground. While appellee was holding one section of the bailer down with his foot, there was a violent upsurge of oil out of the well and the bailers were lifted some distance out of the hole and he was thrown into the air and fell on the platform sustaining the injuries for which he sought damages. He testified that at the time he heard a noise like a .22 rifle shot. The accident occurred around three o'clock A.M. on September 7. Thereafter Linss proceeded with the cal-sealing operations. Du Pont's employees came back to the well that afternoon and remained at the well for some time prior to and after four P.M. with testing equipment to record the explosion. No explosion was heard nor registered. T. C. S. Drilling Company employees then drilled out the hardened cal-seal and found that the shot had gone off.

██ Appellee sought to have his case submitted in the trial court on the doctrine of res ipsa loquitur and complains of the action of that court in refusing to thus submit it and in submitting it on the theory of general negligence. The question is raised whether appellee, having failed to cross appeal, may now complain of the action of the trial court in this respect. Appellee found himself in the anomalous position of having obtained the judgment he sought on a theory other than the one on which he sought to try his case. He thus was not in a position to complain by appeal.

We are of the opinion that there is no evidence of general negligence warranting the submission of the case to the jury and that the trial court erred in not sustaining appellant's motion for a directed verdict and for that reason the judgment must be reversed and the cause remanded.

Assuming that the case should have been submitted on the theory of res ipsa loquitur, are we powerless to remand with directions to grant a new trial on that theory because the error was not presented on a cross appeal? This would result in a manifest miscarriage of justice and would make a mockery of the maxim that: "For every wrong there is a remedy." Appellate courts have inherent power to correct substantial error occurring during a trial even though not directly raised. In referring to the general rule that one who has not appealed may not, as a matter of right, question the correctness of the court's judgment, the Supreme Court in Langnes v. Green, 282 U.S. 531, 538, 51 S.Ct. 243, 246, 75 L.Ed. 520, states: "These decisions simply announce a rule of practice which generally has been followed; but none of them deny the power of the court to review objections urged by respondent, although he has not applied for certiorari, if the court deems there is good reason to do so." [1]

We conclude that we have inherent power to reverse and remand with direction to grant a new trial if the case should have been submitted on the doctrine of res ipsa loquitur.

██ As pointed out in the cases, the doctrine of res ipsa loquitur is the creature

1. To the same effect see also: Public Service Commissioner v. Havemeyer, 296 U.S. 506, 509, 56 S.Ct. 360, 80 L.Ed. 357; Shaw v. Addison, 236 Iowa 720, 18 N.W. 2d 796, 803; Clark v. Wells-Elkhorn Coal Co., 215 Ky. 128, 284 S.W. 91, 93.

of necessity. It is imported into our jurisprudence to avoid a miscarriage of justice in those negligence cases in which the dangerous instrumentality is exclusively in the control of one charged with liability and in which there is secrecy or invisibility of the danger of which the outsider could know nothing and concerning which the owner thereof because of his exclusive control and possession has knowledge.

A good statement of the philosophy of this doctrine is found in Boulder Valley Coal Co. v. Jernberg, 118 Colo. 486, 197 P.2d 155, 156, where it is stated: " 'The reason or theory of the doctrine of res ipsa loquitur is based in part upon the consideration that, as the management and control of the agency which produced the injury is, under the circumstances to which the doctrine applies, exclusively vested in defendant, plaintiff is not in a position to show the particular circumstances which caused the offending instrumentality to operate to his injury, while defendant, being more favorably situated, possesses the superior knowledge or means of information as to the cause of the accident, and should, therefore, be required to produce the evidence in explanation. *Accordingly if the circumstances do not suggest or indicate superior knowledge or opportunity for explanation on the part of the party charged or if plaintiff himself has equal or superior means of information, the doctrine cannot be invoked.*' "

And again: "The doctrine 'is the creature of stern necessity for the sake of guarding against a miscarriage of justice that in a negligence case might follow because of the mere secrecy or invisibility of danger concerning which the outsider could know nothing. It is a doctrine that must be kept within comparatively narrow limits, lest a desire to promote justice bring about the defeat of justice instead.' "[2]

And in East End Oil Co. v. Pennsylvania Torpedo Co., 190 Pa. 350, 42 A. 707, 708, it is pointed out that in order for the doctrine to apply it is essential to show that the "transaction in which the accident occurred was in the exclusive management of the defendant, and all the elements of the occurrence within his control, and that the result was so far out of the usual course that there is no fair inference that it could have been produced by any other cause than negligence. If there is any other cause apparent to which the injury may with equal fairness be attributed, the inference of negligence cannot be drawn."

The East End Oil Company case was a well shooting case, and among other reasons for not applying the doctrine in that case, the court said that: "There was no evidence that the result complained of was so uncommon as to be of itself evidence of negligence."

And "The cause of the accident was largely conjectural, and it may as well have arisen from the loose and crumbling nature of the well walls as from defendant's negligence."

Our search has failed to find a single case in which the doctrine was applied where injury resulted from the shooting of an oil and gas well. There are numerous such cases in all of which the courts have refused to apply the doctrine on the ground that the dangerous instrumentality was not in the exclusive control of the one sought to be charged; that the result was not so uncommon or unusual that it could be said that it must have been the result of negligence; and because in all such cases there were numerous other causes which could have produced the accident.[3]

2. See also, Yellow Cab Co. v. Hodgson, 91 Colo. 365, 14 P.2d 1081, 83 A.L.R. 1156; Berkens v. Denver Coca-Cola Bottling Co., 109 Colo. 140, 122 P.2d 884.

3. Carter Oil Company v. Independent Torpedo Co., 107 Okl. 209, 232 P. 419; Eastern Torpedo of Ohio Co. v. Shelts et al., 121 Okl. 129, 247 P. 974; Pure Torpedo Corp. v. Nation, 327 Ill.App. 28, 63 N.E.2d 600; Kentucky Glycerine Co. v. Woodruff Development Co., 233 Ky. 325, 25 S.W.2d 736; East End Oil Co. v. Pennsylvania Torpedo Co., 190 Pa. 350, 42 A. 707.

The above cases are oil well shooting cases in all of which the courts refused to apply res ipsa loquitur.

The question apparently has never been before the Supreme Court of Colorado in this particular kind of a case, but Colorado has had occasion to consider and apply the doctrine of res ipsa loquitur and it lays down the usual standards and tests under which the doctrine will apply.[4]

From the above, we conclude that this is not a res ipsa loquitur case. The appellant did not have the exclusive control of the well nor yet of all the operations involved in the shooting of the well. It was employed to perform one function and one function alone, to place the charge in place according to the specification of the superintendent of Phillips, and place the umbrella over the charge. Other operations which formed a part of the shooting of the well were thereafter carried on by independent contractors with which appellant had no connection. After it placed the charge, it left the premises and did not return until about four o'clock the next afternoon when the charge was supposed to explode. It is apparent that the premature explosion might have been brought about by one of a number of different causes. Thus, the pay section in Levison Number 6 lay in the Weaver sand with its intermittent strata of shale subject to sloughing and cave-ins, a recurring trouble in oil wells. According to Mr. Lewis, a cave-in occurring around or about the shot placed in Levison Number 6 could reasonably have detonated the explosive charge, and then again an enlarged hole due to inexpert drilling could cause one run of shells to pass by, or set insecurely upon, the run below, thus creating a hazard which could lead to a premature explosion, or yet, a so-called "water hammer" or "liquid hammer" phenomenon could occur, that is, a sudden evacuation of fluid or gas in the well into a fissure or crevice in the pay section which would allow the heavy column of fluid above to drop, and this would set off the nitroglycerin in the well. Also, the well had

been flowing 200 barrels per day by heads. The well had to be killed to make it safe for shooting. It was killed, but there was evidence that such a well is subject to unexpected flows and may erupt at any time, and that such a sudden flow of oil or gas could easily cause a premature explosion. Any one of these conditions could have brought about a premature explosion. None of these, if they occurred, were caused by the negligent handling of the dangerous instrumentality employed by Du Pont. Furthermore, as held in the East End Oil Company case, supra, a premature explosion of glycerine in a well shooting operation is not so uncommon as to be of itself evidence of negligence. It is only when the accident is so unusual and when there is a complete absence of any other probable causes that res ipsa loquitur can be said to apply. In line with all of these cases, we conclude that it was not a res ipsa loquitur case.

The question then is did the court err in overruling appellant's motion for dismissal at the conclusion of plaintiff's evidence and for a directed verdict at the conclusion of all of the evidence? As has been said times without number, negligence, like all other facts, must be proven and the conclusion of that fact, like other facts, cannot be deduced from speculation and conjecture.[5]

For the purpose of the opinion, it may be assumed that appellant was guilty of negligence in not checking the temperature and bottom-hole pressure of the well. It seems to be conceded that the temperature and bottom-hole pressure in the wells in the field were uniform, but it does not necessarily follow nor is it conceded that such uniformity would exist or did exist in all wells. Neither would that, in our opinion, absolve appellant from making these tests before employing this very dangerous instrumentality. Appellant was held to the exercise of the highest degree of care in the use of this instrumentality.

4. Boulder Valley Coal Co. v. Jernberg, 118 Colo. 486, 197 P.2d 155; Home Public Market v. Newrock, 111 Colo. 428, 142 P.2d 272; See also cases in footnote 2.

5. Mountain Motor Fuel Co. v. Rivers, 65 Colo. 561, 170 P. 1164; Dodo v. Stocker, 74 Colo. 95, 219 P. 222.

But assuming that it was negligence for appellant not to make these tests, before such negligence will impose liability, it must be the proximate cause, or at least contribute to the resultant injury. But there is no evidence which would support such a conclusion. The premature explosion could be caused by pressure or high temperature only if conditions other than those found in the wells in the field existed in this well. There is not a scintilla of evidence which would support the conclusion that such conditions did or can reasonably be assumed to have existed, and to hold that merely because the premature explosion resulted, these conditions must have existed, is piling speculation upon speculation and conjecture upon conjecture. That is so especially when the evidence establishes that there were three or four other causes, any one of which might have brought about the result. It was incumbent upon appellee to establish by direct evidence or by fair inferences drawn from evidence that the failure on appellant's part to check the temperature and bottom-hole pressure was the contributing cause of the loss suffered. This he failed to do.

Finally it is contended that the judgment should be sustained on the doctrine of liability without fault. That doctrine is applied to ultra hazardous occupations and makes one engaged in such occupations liable to another whose person or property is injured by such activities, although the utmost care is exercised to prevent harm.[6] That doctrine, however, is restricted to injury to adjoining property and to persons on adjoining property, and does not apply to cases where injury results to those who have reason to know of the risk which makes the undertaking ultra hazardous, take part therein, and bring themselves within the area which will be endangered by its miscarriage.[7] All of these factors apply to appellee. He was a licensee upon the premises in the course of his employment and by direction of his superior was participating in the operations in question at the time of the accident. Under such circumstances, appellant was liable to him only for actionable negligence.

Reversed and remanded with directions to dismiss the action.

6. Restatement, Law of Torts, Paragraph 519; 35 C.J.S., Explosives, § 8.

7. Restatement, Law of Torts, Paragraph 523.