James A. CASPER and Marguerite Casper, Appellants,

v.

BARBER & ROSS COMPANY, a corporation, and Warfield & Sanford, Inc., a corporation, Appellees.

No. 15520.

United States Court of Appeals District of Columbia Circuit.

Argued June 15, 1960.

Decided Jan. 19, 1961.

Petition for Rehearing Denied Feb. 14, 1961.

---

Wilbur K. Miller, Chief Judge, dissented in part.

Mr. Joseph D. Bulman, Washington, D. C., with whom Messrs. Sidney M. Goldstein and Leo N. McGuire, Washington, D. C., were on the brief for appellants. Mr. John E. Kennahan, Washington, D. C., also entered an appearance for appellants.

Mr. Frank F. Roberson, Washington, D. C., with whom Mr. John P. Arness, Rockville, Md., was on the brief, for appellee Barber & Ross Company.

Mr. Thomas S. Jackson, Washington, D. C., with whom Messrs. Robert M. Gray, John W. Jackson, Steven A. Winkelman, and Maurice Friedman, Washington, D. C., were on the brief, for appellee Warfield & Sanford, Inc.

Before WILBUR K. MILLER, Chief Judge, and BAZELON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

James A. Casper, hereinafter referred to as appellant, was an elevator inspector employed by the District of Columbia, who was injured May 2, 1956 while riding on the top of a slowly ascending freight elevator. He had previously ordered repairs to be made on three elevators located in the premises of appellee, Barber & Ross Company (herein Building Company). Repairs were performed by appellee, Warfield & Sanford, Inc. (herein Elevator Company). Casper sued both appellees. The trial judge directed a verdict for appellee, Barber & Ross Company, at the close of the plaintiffs' case. Warfield & Sanford, Inc. filed its motion for directed verdict at the close of the evidence, but a ruling thereon was reserved. The jury returned a verdict awarding damages to Casper and his wife [1] against appellee,

1. Since Mrs. Casper's claim for damages for loss of consortium must stand or fall with Casper's claim based on personal injuries, we shall hereinafter refer only to Casper as appellant.

Warfield & Sanford, Inc. After verdict Warfield & Sanford, Inc. filed its timely motions for judgment n. o. v. which the judge granted,[2] and for a new trial. The latter motion asserted errors of law properly cognizable in the consideration of such a motion, but the judge did not rule on the motion for new trial. No cross appeal was taken by the Elevator Company, and appellant has made no claim of error because of the failure of the judge to rule on the motion for new trial.[3]

Appellant presents questions as to whether or not (1) the District Judge erred in setting aside the verdicts against the Elevator Company and entering judgment for the Elevator Company and (2) in directing a verdict for the Building Company.

Mr. Casper, about 58 years old at the time of the injury, had had long experience in the installation, repair, maintenance and service of elevators. Beginning in 1923, and thereafter employed by Houghton, Otis and other elevator companies, his service and training culminated in 1938 in his becoming an elevator inspector for the District of Columbia.

His duties in that capacity included the making of periodic inspections of all types of power elevators. The inspection process included two phases, one "routine," under his own control, the other a "check-up," to ascertain whether or not required repairs had been accomplished. He worked in sole charge of an assigned territory, inspecting power-driven elevators about every four months. The elevator on which he was injured was a power-driven elevator as to which Mr. Casper personally had made "routine" inspections some three or four times a year over a period of four or five years before the date of his injury. A "routine" inspection of the Barber & Ross elevator entailed some 20 to 30 minutes of his time. Such an inspection consisted of examining the equipment in the lower level of the hatchway or shaft, the doors, cables, switches and related equipment, after which he normally would proceed to the "overhead," the penthouse, there to conduct further inspection of the machinery and controls. Every "routine" inspection included such surveys.

To execute his function when on a *routine* inspection, Mr. Casper mounted the *top* of the elevator, and then called upon a person supplied by the management of the building to operate the car. He testified it was necessary to ride on top of the elevator since only from that vantage point could all equipment in the elevator shaft really be examined. "It's the only place you can look at cables, it's the only place you can get a constructive and full view of your doors and the equipment of the shaft itself." When on top of the elevator in the course of a routine inspection, he customarily arranged for signals between himself and the operator, usually by a call such as "Let's go up"; "Hold it"; "Take it down a little bit"; "Hold it."

2. The order reads:
"Order for Judgment for Defendant Under Rule 50 on Motion for a Directed Verdict
"This cause having come on for further hearing upon the motion of the defendant, Warfield & Sanford, Inc., for a directed verdict at the conclusion of the plaintiffs' case, said motion having been renewed at the close of all the evidence, and the Court having reserved decision upon said motion under Rule 50(b) of the Federal Rules of Civil Procedure [28 U.S.C.A.], and the Court having heard argument upon said motion both before and after verdict; and the Court having concluded that the motion for directed verdict should be granted, it is by the Court this 24th day of November, 1959,
"Adjudged and Ordered that the motion of the defendant, Warfield & Sanford, Inc., for a directed verdict in its favor herein be and the same is hereby granted, and the verdicts of the jury herein in favor of the plaintiffs, James A. Casper and Marguerite Casper, are hereby vacated and set aside; and judgment be and it is hereby granted to the defendant, Warfield & Sanford, Inc."

3. Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 251, 253, 61 S.Ct. 189, 85 L.Ed. 147; cf. Johnson v. New York, N. H. & H. R. Co., 1952, 344 U.S. 48, 53, 54 note 3, 73 S.Ct. 125, 97 L.Ed. 77.

Upon discovering in the course of a routine inspection that some work on the elevator or the equipment is required, the inspector must prepare a report, after which a letter will be directed to the building owner prescribing a certain period within to complete the indicated repairs. Thereupon the building owner is required to cause the repairs or adjustment to be effected. When the elevator inspector's office has been notified that the indicated work has been done, the inspector once again visits the premises to "check up," to examine the extent and the nature of the compliance with the repair order.

To reach the penthouse in the shaft where the injury occurred, Mr. Casper on each previous occasion had come to the second floor of the Building Company, had then climbed on top of the elevator, and directed whoever was running it "to take the car up, stop it, take it up, to stop it, up, till I reached a point that was convenient for me and safe, and give directions to either—on down, probably." He personally had made such a "routine" inspection on March 26, 1956.

Mr. Casper thus was familiar with this particular elevator. The penthouse floor where the machinery was located was constructed of heavy metal grille. There was an opening in the metal grille about 22″ x 30″. On each of his previous routine inspections Mr. Casper, standing on top of the elevator, had passed through that opening up to his waist to make his inspection above the grille.

The elevator was operated by a rope which could be grasped by a person on top of the elevator. If the rope were pulled up, the car could be sent down. If the rope were pulled down, the car could be sent up. If the rope were "centered," the car would stop.

On May 2, 1956, Mr. Casper, Mr. Stout, an employee of the Elevator Company, and a repairman's helper, Mr. Madigan, spent the morning together while Mr. Casper was inspecting two other elevators in the Building Company's premises. They were out for some 30 to 45 minutes to have lunch. Mr. Casper had two beers but Stout had none. Returning, the three went in the elevator to the second floor. There Mr. Casper pushed up and propped a guard gate. The elevator was sent down until its roof was flush with the second floor. Mr. Casper then walked onto the elevator roof. From the roof of the elevator to the opening in the grille work was a distance of about 10 feet. Mr. Casper was about 5′5″ tall. With him on top of the elevator was Mr. Stout, who was about 5′9″ tall. Thus the distance between Mr. Stout's head and the penthouse grille was some four feet three inches and comparably, from the top of Casper's head to the floor of the penthouse, it was about four and one-half feet. Mr. Madigan remained on the second floor. There was nothing overhead to obstruct Mr. Casper's vision. The grille was in plain sight. Either Mr. Stout or Mr. Casper could have reached the rope to stop the car as it ascended.

Mr. Casper testified that he made no suggestions as to how he and Stout were to get up to and through the aperture. Neither Mr. Stout nor Mr. Madigan had ever been up on the elevator. Mr. Casper had never measured the overhead clearance although "It's my job to measure it; yes, sir."

"If you had measured it you would have known what clearance there was between the top of the car and the overhead grille when the car came to its automatic stop, wouldn't you? A. Probably."

Mr. Casper had *in mind* that the elevator would be brought to a point, perhaps a foot from the top of the grating, after which the car would be eased up, a little bit at a time, "inching it up," as Mr. Casper himself had done on other occasions, but he said nothing to Stout about such a possibility. Mr. Casper simply had no conversation about any such plan or procedure.[4]

4. They could have put a ladder on top of the elevator and thus have climbed to the aperture, but that would have meant a lot of work for Stout and Madigan, Mr. Cas-

The roof of the elevator itself was solid. As Mr. Casper stood on top of it he could not see where the mechanic's helper was. He did not know whether or not the helper was on the car. He knew that if the helper were operating the elevator from below, the upward course could be changed only as the result of someone's "telling him to start or stop." The elevator's upward speed was very slow, estimates varying from one-half foot per second, to 35 or 45 feet per minute.

Thus without the formulation of any particular procedure, Mr. Casper and Mr. Stout took their positions on the top of the car. Mr. Casper gave no instructions as to the management of the car. Mr. Stout placed himself under the aperture, grasped the rope and started the car. He kept watching the aperture as the elevator slowly ascended.

Mr. Casper testified that when the grille was six or eight inches above his head he cried out, " 'Stop it,' or 'Hold it' or some expression * * *." The elevator continued to move upward however. He then dropped to the roof of the elevator "to make [himself] * * * as small as [he] * * * possibly could." He had no clear recollection of when the elevator actually stopped ascending.

Such generally, was the state of the evidence when the Elevator Company's motion for directed verdict at the close of appellant's case was denied. The Building Company's similar motion was then granted.

The Elevator Company's motion for directed verdict was renewed at the close of all the evidence, the trial judge reserving decision, as he said, "under Rule 50(b)." The Elevator Company

submitted requests for instructions on various points, but particularly with respect to the Elevator Company's theory that Casper had assumed the risk of injury. The defense had been asserted in the Elevator Company's answer and had been relied upon at pretrial. The issue was pressed throughout the case, but the requested prayer was denied. After the jury had returned a substantial verdict for the appellant, the Elevator Company filed its timely motion entitled "Motion for Judgment Non Obstante Veredicto or, in the alternative, for a new trial." Among the grounds stated for the latter, the Elevator Company asserted as error of law, the trial court's failure to instruct the jury on the doctrine of assumption of risk.

■ Apparently the trial judge assumed that if he granted the motion for judgment n. o. v., it would be unnecessary to rule upon the motion for new trial and that the latter motion had passed out of the case.[5] That is not so. The Supreme Court has pointed out that the motion for judgment notwithstanding the verdict and the motion for a new trial have different and peculiar offices. "The rule contemplates that either party to the action is entitled to the trial judge's decision on *both* motions, if both are presented."[6] Again,

"the courts should so administer the rule as to accomplish all that is permissible under its terms. * *

"If alternate prayers or motions are presented, as here, we hold that the trial judge should rule on the motion for judgment. Whatever his ruling thereon he should also rule on the motion for a new trial, indicating the grounds of his decision."[7]

per said, "putting the ladder up and taking it down."

5. Such was the view of the Eighth Circuit in Duncan v. Montgomery Ward & Co., 1940, 108 F.2d 848, 853. About that time this court also had some doubt on the point. See, e. g., Pessagno v. Euclid Inv. Co., 1940, 72 App.D.C. 141, 144, 112 F.2d 577, 580.

6. Montgomery Ward & Co. v. Duncan, supra note 3, 311 U.S. at page 251, 61 S.Ct. at page 194.

7. Id., 311 U.S. at page 253, 61 S.Ct. at page 195; 5 Moore, Federal Practice § 50.12 (2d ed. 1951). Cf. Johnson v. New York, N. H. & H. R. Co., 1952, 344 U.S. 48, 53, 73 S.Ct. 125, 97 L.Ed. 77.

We have latterly so applied the rule.[8] In the Moore case the trial judge granted both motions, and we approved the practice. We there pointed out that if the judgment n.o.v. shall be found to have been *properly* entered, there is no need to remand the case for a new trial. In the instant case, our own disagreement after extended consideration assuredly emphasizes the majority's view that jury questions were raised as between the appellant and the Elevator Company,[9] not only as to negligence and contributory negligence, but as to the issue of assumption of risk. The failure to charge on the latter nullified the verdict, and in fairness to both sides, a new trial must be ordered as "just under the circumstances."[10]

Typically, but by no means exclusively in this jurisdiction, the defense of assumption of risk has come into play in master and servant cases. As we said in Fitzpatrick v. Fowler[11]:

"The plain import of the common law doctrine of assumption of risk is that if the employee knew of the dangerous condition, or could have known of it by the exercise of reasonable care, he should be held to have assumed the risk incident to such danger, for he is presumed to see and understand dangers that a prudent person would see and understand, which he might protect himself against by exercising reasonable care for his own safety. [Citing cases] And where the risk of danger was or must have been known to the injured employee, it is immaterial that it may have been forgotten at a critical moment."

Even so, apart from cases arising between master and servant we have continued to recognize that "contributory negligence and assumed risk" are not necessarily synonymous. We have said that an important difference between the two may be "easily discerned, since the former depends entirely upon conduct and the latter involves a mental state of willingness."[12] Had the jury here been instructed first to determine whether the Elevator Company's Mr. Stout owed a duty to the appellant under the circumstances shown and if so, then to have decided whether or not the appellant willingly assumed the risk of his own possible harm, a very different result might have been produced.[13] We can not say that the failure to have granted the Elevator Company's requested instruction was not vital.

The Elevator Company after the charge took exception to the omission of an instruction as to its assumption of risk defense. The majority has concluded that the trial judge erred in failing to instruct the jury as requested. Although the claim of error was presented in the motion for a new trial, the trial court did not rule upon it, nor did

---

8. Moore v. Capital Transit Co., 1955, 96 U.S.App.D.C. 335, 226 F.2d 57, certiorari denied, 1956, 350 U.S. 966, 76 S.Ct. 434, 100 L.Ed. 839; cf. Jackson v. Wilson Trucking Corp., 1957, 100 U.S.App.D.C. 106, 108, 243 F.2d 212, 214, where no motion for new trial had been timely filed.

9. Pokora v. Wabash Ry. Co., 1934, 292 U.S. 98, 106, 54 S.Ct. 580, 78 L.Ed. 1149; Miller v. Union Pacific R. Co., 1933, 290 U.S. 227, 233, 234, 54 S.Ct. 172, 78 L. Ed. 285; Hellweg v. Chesapeake & Potomac Telephone Co., 1940, 71 App. D.C. 346, 110 F.2d 546; and see Washington & G. Railroad Co. v. McDade, 1890, 135 U.S. 554, 572, 10 S.Ct. 1044, 34 L.Ed. 235.

10. 28 U.S.C. § 2106.

11. 1948, 83 U.S.App.D.C. 229, 231, 168 F. 2d 172, 174; Fidelity Storage Co. v. Hopkins, 1915, 44 App.D.C. 230, 236; cf. Burgan v. Dreyfuss, 1958, 104 U.S. App.D.C. 280, 261 F.2d 746.

12. Weber v. Eaton, 1947, 82 U.S.App.D.C. 66, 67–68, 160 F.2d 577, 578–579.

13. Smith v. John B. Kelly, Inc., 1960, 107 U.S.App.D.C. 140, 275 F.2d 169; Dougherty v. Chas. H. Tompkins Co., 1957, 99 U.S.App.D.C. 348, 240 F.2d 34; and see James, Assumption of Risk, 61 Yale L.J. 141, 143 (1952). Cf. Uline Ice v. Sullivan, 1950, 88 U.S.App.D.C. 104, 187 F. 2d 82.

either party thereafter ask for such a ruling.[14]

Notwithstanding, the error is one of law which, under the unusual circumstances of this exceptional case, prompts us "where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court * * * below."[15] For the reasons stated, we direct that the judgment for the Elevator Company be vacated and that an order be entered granting a new trial.[16]

■ There was no error in granting the motion of the Building Company for a directed verdict at the close of the appellant's case. No employee of the Building Company was involved in any way whatever. There was no proof that the Elevator Company had been negligently selected or that it was not competent to effect the repairs as ordered. There is no showing that the Building Company at the time even so much as knew that Mr. Casper and the employees of the Elevator Company were on the premises of the Building Company. Absent a showing of negligence on the part of the Building Company in the foregoing respects or any other, the judgment in favor of the Building Company is affirmed.[17]

The judgment in favor of the Elevator Company is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

Affirmed as to Barber & Ross Co.

Reversed as to Warfield & Sanford, Inc.

WILBUR K. MILLER, Chief Judge (concurring in part and dissenting in part).

Being of the opinion that the trial judge was correct in directing a verdict in favor of Barber & Ross, I concur in the portion of the majority opinion which affirms that action. I dissent, however, from the reversal of the judgment n. o. v. awarded to Warfield & Sanford. Of course, the majority, having reversed that judgment, were bound to remand for a ruling on the motion for a new trial. But the remand would not have been necessary had the judgment n. o. v. been affirmed, as I think it should have been; for affirmance of that judgment would render immaterial the error of the trial judge in failing to rule on the motion for a new trial, as I shall show.

My opinion is that the judgment n. o. v. was properly granted because, as may be seen from the factual recital in the majority opinion, the evidence showed no negligence on the part of Warfield & Sanford but revealed, I think, that Casper's injury was due to his sole negligence. Should it be thought, however, that some evidence tended to attribute negligence to Warfield & Sanford, there still can be no recovery against it, in my view, because Casper was clearly guilty of contributory negligence as a matter of law.

14. Clearly, appellee could, and should, have cross assigned error as to the point Montgomery Ward & Co. v. Duncan, supra note 3, 311 U.S. at page 254, 61 S.Ct. 189.

15. Hormel v. Helvering, 1941, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037; cf. 5 Moore, Federal Practice § 50.15 (2d ed. 1951). And see E. I. DuPont de Nemours & Co. v. Cudd, 10 Cir., 1949, 176 F.2d 855, 857; Schaff v. R. W. Claxton, Inc., 1944, 79 U.S.App.D.C. 207, 144 F.2d 532; 28 U.S.C. § 2106.

16. Had our concern involved only appellee's claim in its motion for new trial that the verdict was contrary to the

weight of the evidence, we would have remanded the case for exercise by the trial judge of his discretion. Cone v. West Virginia Paper Co., 1947, 330 U.S. 212, 216, 67 S.Ct. 752, 91 L.Ed. 849; Wilson v. Bailey, 10 Cir., 1958, 257 F. 2d 352, 354; Robinson v. Isbrandtsen Co., 2 Cir., 1953, 203 F.2d 514, 516; cf. Atkins v. Halliburton Oil Well Cementing Co., 5 Cir., 1952, 196 F.2d 876. See generally, 58 Colum.L.Rev. 517 (1958).

17. Lord v. Lencshire House, Ltd., 1959, 106 U.S.App.D.C. 328, 331, 272 F.2d 557, 560.

It was technical error for the trial judge to fail to rule on the motion for a new trial, for the Supreme Court said in Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 253, 61 S.Ct. 189, 195, 85 L.Ed. 147:

> "If alternative prayers or motions are presented, as here, we hold that the trial judge should rule on the motion for judgment. Whatever his ruling thereon he should also rule on the motion for a new trial, indicating the grounds of his decision. * * * "

Our problem, then, in considering the Warfield & Sanford angle of this case has been to determine whether we should remand to the District Court to hear and rule upon the motion for a new trial, or whether we should say "that course would, in the circumstances, be neither fair nor practical."[1] Our choice depended entirely upon whether we affirmed or reversed the judgment *n. o. v.* As I would affirm that judgment, I think we should disregard the trial judge's technical error in failing to pass on the motion for a new trial.

In view of the District Court's grant of judgment *n. o. v.,* it is unthinkable that the motion for a new trial would have been denied had it been passed on. But, if the District Court originally had granted not only the motion for judgment *n. o. v.* but also the motion for a new trial, it would have been necessary for its order to specify that the new trial was being granted only in the event of an appellate reversal of the judgment *n. o. v.;* because the unconditional grant of a new trial would have vacated that judgment. Allegheny County v. Maryland Casualty Co., 3 Cir., 132 F.2d 894, certiorari denied, 318 U.S. 787, 1943, 63 S.Ct. 981, 87 L.Ed. 1154.

Therefore, if the judgment *n. o. v.* were being affirmed, as I think it should be, it would be an idle and useless act to remand the case for a ruling on the motion for a new trial, which inevitably would be conditioned as in the Allegheny County case. But, as I have said, the majority's reversal of the judgment *n. o. v.* makes remand essential.

---

1. Montgomery Ward & Co. v. Duncan, 311 U.S. at page 255, 61 S.Ct. at page 196.