Pure Torpedo Corporation, Appellant, v. Ben H. Nation, Appellee.

Term No. 45F1.

Heard in this court at the May term, 1945.    Opinion filed October 26, 1945.
Released for publication November 27, 1945.

PYLE & McCALLISTER, of Carmi, and EKERN, MEYERS & MATTHIAS, of Chicago, for appellant; DONALD L. THOMPSON and ARTHUR F. GRUENWALD, both of Chicago, and ALBERT W. McCALLISTER, of Carmi, of counsel.

MILLS, UMFLEET & MILLS, of Fairfield, for appellee.

MR. JUSTICE BARTLEY delivered the opinion of the court.

The appellant, the Pure Torpedo Corporation, plaintiff below, brought an action on an account stated to recover $914 against the appellee, Ben H. Nation, defendant and counterclaimant below. The defendant counterclaimed and alleged that the plaintiff was guilty of negligence in the shooting of an oil well owned by the defendant in that the shot was improperly placed by plaintiff 130 feet above the lower part of defendant's well; that when the shot was exploded it destroyed the lower part of the well, damaging it and causing the well to be destroyed, whereby he sustained damages of $17,556.42. A jury was waived and the case was tried before the court, which entered judgment in favor of the defendant for $11,055.26. It is conceded by appellee that this amount should have been $10,135.26. The court arrived at this amount by determining what he conceived to be the cost of the oil well, less the salvage, and then credited the amount with $664, being the amount of the alleged account stated less the charge for shooting the oil well in question.

The plaintiff is a manufacturer of nitroglycerin and is engaged in the business of shooting oil and gas wells.

The defendant is engaged in the business of drilling and operating oil and gas wells.

On November 18, 1940, the defendant owned the leasehold on what is known as the McIntosh Well No. 1. On that date he entered into an oral agreement with the plaintiff to shoot the well in question for the purpose of shooting what is known as the Aux Vaus formation, and thereby endeavor to make the well oil producing in paying quantities. At that time the well hole was approximately 3,255 feet deep. The bottom of the casing was 3,214 feet deep, and it was agreed between the plaintiff and defendant that the shot should be placed at the bottom of the well with the top of the shot at a depth of about 3,222 feet, allowing a distance of 8 feet between the top of the shot and the bottom of the casing. It was further agreed that 100 quarts of solidified nitroglycerin, which according to the record does not explode with the speed of liquid nitroglycerin, were to be placed and exploded. These determinations as agreed upon were made by the defendant.

The plaintiff contends as a ground for reversal that the manifest weight of the evidence shows there was an account stated between the parties, for which it was entitled to a judgment of $914, together with interest from the date of the account stated, namely, January 21, 1941; that such account stated constituted a bar to any claim for negligence on the part of the defendant in the shooting of the well in question; that the evidence fails to show that the plaintiff was guilty of any negligence causing the damage in question; and that the defendant waived any right of action for negligence by an implied contract with the plaintiff.

The evidence shows without any contradiction that there was a balance due the plaintiff from the defendant of $914 for materials furnished and services performed, which included an item of $250 for material furnished and services performed in the shooting of the well in question, and that an account was rendered

January 21, 1941. The evidence further shows that about this date the defendant was rendered a bill for the amount, that he retained it without objection, and on a number of occasions agreed to pay it. The defendant does deny an unqualified promise to pay in that he says that he only promised to pay upon settlement being made for the damages to the well in question. He is uncorroborated in any way in this question. The first demand by him for damages was when he filed his counterclaim after being sued. On the other hand, his own account books showed the balance to be $914, and his own auditor in a communication with the plaintiff verified the amount, and on a number of occasions the defendant admitted to at least three officers and employees of plaintiff the balance of the indebtedness due of $914 and promised to pay the same. These witnesses directly contradict the defendant in his statement that he qualified his promise to pay. The evidence shows that at no time did the defendant make any objection to the account.

In the case of *Dean & Son v. W. B. Conkey Co.,* 180 Ill. App. 162, the court commencing on page 178 discusses the meaning of an account stated and the law relative to it, and says:

"In 1 Am. & Eng. Ency. L. & P., p. 688, it is said:
" 'An account stated is an agreement between parties who have had previous transactions of a monetary character, that all the items of the accounts representing such transactions are true and that the balance struck is correct, together with a promise, express or implied, for the payment of such balance. . . . (p. 689) In stating an account, as in making any other agreement, the minds of the parties must meet. . . . (p. 693) The meeting of the minds of the parties upon the correctness of an account stated is usually the result of a statement of account by one party and an acquiescence therein by the other. The form of the ac-

quiescence or assent is, however, immaterial, and may be implied from the conduct of the parties and the circumstances of the case. . . . (p. 699) Where an account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection, this constitutes a recognition by the latter of the correctness of the account and establishes an account stated. . . . (p. 716) An account stated is in the nature of a new promise or undertaking, and raises a new cause of action between the parties. . . . (p. 723) It is deemed conclusive both at law and in equity unless impeached for mistakes or fraud. . . . (p. 725) The defense to an action upon an account stated must relate to it and not to matters of anterior liability, except in so far as they constitute a foundation for the introduction of evidence to the real substantial defense impeaching the settlement for fraud, error, or mistake. . . . (p. 731) The burden of proof is upon the party seeking to open an account stated for fraud, or to surcharge or falsify such an account on the ground of omission or mistake. . . . The fraud or mistake must be clearly shown. . . . (p. 723) Where the facts tending to show the statement of account are undisputed, the question as to whether the transaction amounts to an account stated is for the determination of the court, as where the entire evidence consists of correspondence.'

"The law, as stated in the text book referred to relative to accounts stated, we believe to be the law of this state. In *State v. Illinois Cent. R. Co.,* 246 Ill. 188, page 241, it is said:

" 'A stated account is an acknowledgment of an existing condition of liability of the parties, from which the law implies a promise to pay the balance thus acknowledged to be due. . . . It may be impeached for fraud or mistake. The general rule is, that in an application to open a stated account the

plaintiff must either charge fraud or state particular errors. . . . (p. 242) "A person seeking to open a settled account must specify in his claim either errors of considerable extent, both in number and amount, or at least one important error of a fraudulent nature." . . . (p. 243) The authorities seem to be a unit in holding that mistakes or errors must be specifically alleged and proved. . . . (p. 246) In ordinary business transactions, if an account has been transmitted from one individual to another it will be deemed a stated account from the presumed approbation or acquiescence of the parties, unless an objection is made thereto within a reasonable time. . . . When the facts are undisputed the question is for the court, but when the facts are in dispute in a common law action the question should be submitted to the jury under proper instructions.' See also *Northwestern Fuel Co. v. Western Fuel Co.,* 144 Ill. App. 92; *Wurlitzer Co. v. Dickson,* 153 Ill. App. 36; *Pickham v. Illinois I. & M. Ry. Co.,* 153 Ill. App. 281.

"In *Dick v. Zimmerman,* 207 Ill. 636, 639, it is said: " 'In an action upon an account stated, the original form or evidence of the debt is unimportant, for the stating of the account changes the character of the cause of action, and is in the nature of a new undertaking. The action is founded, not upon the original contract, but upon the promise to pay the balance ascertained.' "

The plaintiff was entitled to recover on the account stated, which as before stated is $914, or not at all. (*Albert Pick & Co. v. Edward Slimmer,* 70 Ill. App. 358.) It was, therefore, improper for the court below in any event to have allowed thereon $664 as a credit on the amount of the judgment awarded in favor of the defendant. Moreover, the preponderance of the evidence shows that there was a stated account between the parties for $914.

As a matter of fact, the court below did not pass upon the question as to whether there was a stated account between the parties, but simply allowed the credit of $664 heretofore referred to on the amount of damages awarded on the counterclaim. In this the court erred.

As to the position of the plaintiff, however, that the stated account barred the alleged cause of action for negligence growing out of the same transaction, this is a different question. An account stated as ordinarily understood has to do with the settling of the previous transactions between the parties of a monetary character. (*Associated Furniture Manufacturers v. Leader House Furniture Co.*, 224 Ill. App. 597.) The balance agreed to be due has to do only with the items considered, and the items not considered may be the subject of setoff or counterclaim. This is the rule in most of the jurisdictions. (Par. 2238, chapter on Accounts and Accounting, vol. 1, Am. Jur. pp. 276–277, 290.) The record does now show that, in arriving at the balance of $914, there was any consideration given by the parties to the alleged claim for damages of the defendant. We conclude from the facts shown by the record that the account stated did not bar the alleged cause of action against the plaintiff.

The well in question had originally been drilled to a depth of 3,375 feet and had previously been shot by the plaintiff, at the request of the defendant, on November 14, 1940. This shot of 70 quarts of nitroglycerin was in what was known as the McClosky formation. This was a lime formation. According to Mr. Nation, there was then oil standing in the well up to possibly 250 feet. There is no question about this shot. It was then determined by the defendant to make a shot in the formation known as the Aux Vaus sand. According to the record this is a hard formation at the well in question. A bridge of gravel was put in to bring the depth of the hole to about 3,250 feet,

and the bottom of the casing was placed at 3,214 feet.
The outside measurements of the pipe was 5½ inches
and the inside measurement was 4 and $^{15}\!/_{16}$ inches. It
was agreed as before stated that 100 quarts of solidi-
fied nitroglycerin were to be used, and that the shot
was to be discharged at a depth from 3,352 up to 3,222
feet. This would allow 8 feet between the top of the
shot and the bottom of the casing.

Under the arrangement made by the plaintiff and
the defendant the plaintiff's responsibility was to place
and discharge the shot, while the defendant was to do
the necessary things to protect the pipe and mechanical
parts of the well from damage by the explosion.

When the shooters for the plaintiff arrived at the
location of the well on November 18, 1940, it was deter-
mined between them and the defendant to put the 100
quarts of nitroglycerin down in 4½ inch shells. The
shooters then checked the depth of the well with $^5\!/_{32}$
of an inch torpedo line by letting down a dummy shell
and determined the depth of the well to be 3,255 feet,
and that the casing was set at 3,214 feet, which gave a
41 foot clearance from the bottom of the casing to the
bottom of the hole. The dummy shell, which was let
down to check the distances, was a 10 quart shell loaded
with gravel weighing about 25 pounds and was 4½
inches in diameter. There were no obstructions in the
casing. Five 20 quart shells 4½ inches in diameter
were loaded with 20 quarts each of nitroglycerin. Each
shell was 5 feet 4 inches long. Three runs were made
to place the shells. The first two had two shells con-
nected together by bails and hooks, and to the last
shell was attached a ''Zero Hour'' time bomb to dis-
charge the shot. The bomb was set with clocks to
discharge the shot six hours after setting. In addition,
there was placed on the last shell, what is known as a
cave-catcher. When the torpedo line was released it
would open up in the form of an umbrella to prevent
gravel from getting along the side of the shells con-

taining nitroglycerin and being forced into the formation. After the nitroglycerin was set, the shooters checked with a measuring meter at the top of the shot and found it to be at 3,222 feet, leaving a clearance of 8 feet to the bottom of the casing. After that, the driller, an employee of the defendant, put a bridge of 4 or 5 feet of gravel on the cave-catcher and this measurement was checked. According to the shooter, Agey, after the bridge was put in, the distance was again checked with a measuring line, and it again checked as to distance; namely, 4 or 5 feet above the top of the shot, which was at 3,222 feet. The defendant then proceeded to load the hole with gravel which has as its purpose, the holding down of the force of the explosion and the protection of the casing. The defendant testified that about 350 feet of gravel was put in the casing above the top of the shot; that at that time his employees made measurements as to the gravel in the casing; that 3½ yards were put in and a yard would fill approximately 100 feet. The evidence was, as a matter of fact, that a yard will fill a pipe like the one in question about 184 feet. The evidence shows that he was not present during all the time the gravel was being put in and obviously he could not have known the quantity put in. The records of the operation, signed by the driller employee of the defendant, was that the top of the nitroglycerin string was 3,214 feet and that about 270 feet of gravel was put in the hole. An expert witness called by the defendant testified that to safely shoot 100 quarts of nitroglycerin to prevent damaging of the pipe, it would require 3 or 4 yards of sand or gravel. The defendant and an employee of defendant testified that as the last shell of nitroglycerin was being lowered they saw the torpedo line slacken, and Mr. Nation testified that he then took it up with the shooters, telling them that he did not think a shell was on the end of the line. The shooters who were standing on the truck on which the

machinery was operated which put down and pulled up the torpedo line, checked the situation and satisfied Mr. Nation that the shells were going down properly and were placed on the bottom. The shot went off in due time, and after this a receipt or memo was signed by Mr. Nation's driller acknowledging the fact that 100 quarts were shot; that the casing was sunk to 3,214 feet; that the top of the shot was 3,222 feet and the bottom of the shot was 3,255 feet. After the shot was exploded, the defendant went into the hole with cable tools to pump out the gravel and found they couldn't get them down more than 3,045 feet, because of an obstruction, which he determined was metal. Charles A. Baldwin, an expert driller and producer of oil was employed by the defendant to work on the well after the defendant found he could not get down in the hole. He testified that around 3,100 feet he encountered the pipe and finally determined that he could not get down, because of pipe, which was loose in the hole, and that he moved off the location and that in his opinion that obstruction was 100 or 150 feet from the bottom. The hole was afterwards abandoned and such parts of pipe as could be were salvaged. As before stated, the employee, Agey, testified positively that the nitroglycerin shot was placed at the bottom of the hole. In this, he is corroborated by a receipt or memo herein before referred to, and also by the drilling report made out by him at the time and signed by Buzz Eddy, a driller employee of the defendant.

The court below in reaching his conclusion that the plaintiff was liable for negligence did so from the fact that the torpedo line seemed to slacken and that after the explosion the pipe was found to be damaged some 130 or 140 feet from the bottom and he concludes that, therefore, the nitroglycerin must have been placed and exploded at this point; and that, therefore, the plaintiff was guilty of negligence in placing and discharging

the nitroglycerin at that point and in not placing it at the bottom of the hole.

Negligence like other facts must be proven and the burden was on the defendant to prove by a preponderance or greater weight of the evidence that the plaintiff was guilty of the negligence charged; namely, of misplacing and discharging the shot at some 130 feet above the bottom of the casing.

The doctrine of *res ipsa loquitur* is not applicable here nor is so contended by the defendant appellee. The fact of negligence must therefore be proven by direct or circumstantial evidence. There is no direct evidence in the record by the defendant and counterclaimant tending to show that the nitroglycerin was placed or exploded improperly. His only evidence as to this is the slackening of the torpedo line and damaging of the casing at the time of the exploding some distance above the bottom. A fact cannot reasonably be inferred from evidence when the existence of another fact inconsistent with the first can be from the same evidence inferred with equal certainty. A fact cannot be said to be established by circumstantial evidence unless the facts relied on are of such a nature and are so related to each other that it is the only conclusion that can reasonably be drawn from them. (*Condon v. Schoenfeld,* 214 Ill. 226; *Ohio Bldg. Safety Vault Co. v. Industrial Board,* 277 Ill. 96.)

The record does not show in any way by expert testimony or otherwise that from the fact that the pipe in the well is found to be destroyed a distance of some 130 feet to 150 feet above the bottom that the nitroglycerin was exploded at that point or that the damage could not have been caused by the nitroglycerin being exploded at the bottom. The record fails to show, either by expert or other testimony, but what the damage to the pipe could just as well have been caused by a failure of the defendant to adequately pro-

tect the pipe from the effects of the explosion as from any other cause. The evidence is barren as to whether the plaintiff did anything, but what was in the usual and customary way of carrying on such operations as it is likewise barren as to whether the defendant did the usual and customary things necessary to protect the pipe from the effect of the explosion. There is nothing in the record to justify a conclusion to the effect that because the torpedo line slackened the canister of nitroglycerin had stopped. It is a matter of common knowledge that many things would cause a line to slacken other than the stopping of the load on its end. Gas coming up would do it. Striking oil in the well would do it. From all that appears in the record, the damage to the pipe may have resulted just as well from failure to properly load it or otherwise adequately protect it as from an explosion at from 130 to 150 feet up from the bottom. The weight of the evidence is that the pipe was only loaded with no more than 300 feet of gravel, whereas some 550–700 feet was required to adequately protect the pipe in this respect. Nowhere in the record is there any proof of the effect of the explosion of nitroglycerin in such quantities as 100 quarts; the force created, or the direction of the force. There is not anywhere in the record any proof of the density of the formation in which the shot was fired, or other conditions of the earth and formations along the pipe in question.

As against the unsatisfactory evidence of the defendant is the direct, uncontradicted evidence of the shooter of the plaintiff that the shot was placed properly, checked as such, and discharged properly. In this he is corroborated by records of the event, including the acknowledgment in writing of the employee of defendant and by other facts and circumstances appearing of record.

■■ The judgment of the trial court, who has heard the evidence and seen the witnesses, will not lightly be interfered with, by a reviewing court. However, in an action for negligence the conclusion of that fact, and the fact of the exercise of due care on the part of the defendant, like other facts cannot be concluded from speculation and conjecture. Among cases announcing this rule in oil shooting cases are: *Davidson v. Humes Torpedo Co.,* 188 Pa. 335, 41 Atl. 649; *East End Oil Co. v. Pennsylvania Torpedo Co.,* 190 Pa. 350, 42 Atl. 707; *Carter Oil Co. v. Independent Torpedo Co.,* 107 Okla. 209, 232 Pac. 419 and *Eastern Torpedo of Ohio Co. v. Shelts,* 121 Okla. 129, 247 Pac. 975. In the *Eastern Torpedo of Ohio Co. v. Shelts* case, the court there among other things said on page 977:

"Neither conjecture nor speculation forms a reasonable basis for arriving at a verdict in a case where recovery is sought upon the alleged negligence of the defendant, but there must be evidence reasonably tending to show that defendant was guilty of some one of the negligent acts charged, and that such negligence was the proximate cause of the injury."

It was further said in that case that conjecture is an unsound and unjust foundation for a verdict.

In the *East End Oil Co.* case (*East End Oil Co. v. Pennsylvania Torpedo Co.,* 190 Pa. 350, 42 Atl. 707) the producer gave the defendant the depth of the well and other information and left the size of the shot to be used to the judgment of the defendant. After the shot, and in the process of cleaning the hole it was discovered that the hole was damaged 200 feet above the oil bearing rock where the shot was supposed to be placed. It was contended that the shot was negligently placed and exploded at this point, causing shale to fall in so badly thereafter that the well had to be abandoned.

The court in that case said:

"It may be conceded, as appellants argue that the blocking up of a well by falling in of loosened materials along its sides is not the usual result of shooting it with a torpedo or the practice would soon cease; but it might be far from usual, and yet not so entirely unusual as to be evidence per se of negligence. . . . The cause of the accident was largely conjectural, and it may as well have arisen from the loose and crumbling nature of the well walls as from the defendant's negligence.

"If there is any other cause apparent to which the injury may with equal fairness be attributed, the inference of negligence cannot be drawn."

In the *Carter Oil Co.* case (*Carter Oil Co. v. Independent Torpedo Co.,* 107 Okla. 209, 232 Pac. 419) the court said:

"We may with an equal amount of reason say that this explosion was caused, either by letting the shell down at too great a rate of speed, or by letting down a shell carrying nitroglycerin on the outside of it, or by striking the shell against a sliver in the casing. . . . The circumstances surrounding the explosion afford no reasonable solution as to its origin. We have seen that a verdict must not be found by conjecture or guess."

From a careful examination of the record we find that the judgment of the court below was contrary to the manifest weight of the evidence.

The basis of the contention of the plaintiff that the defendant by contract waived any right of action for negligence in the shooting is that the words, "All Wells Shot At The Owner's Risk" were printed on the price lists and bills and the like. It is contended that because of this there was an implied agreement relieving the plaintiff from negligence. While the evidence shows that this statement was on some

price lists, bills and the like, yet there were others on which it did not appear. The defendant denies knowledge of seeing any with the statement on it and says, if he had seen it, it would not have meant anything to him. Contracts to relieve one from negligence in so far as they are valid require a meeting of the minds in regard thereto. In view of our conclusion we are not passing on that question. It is sufficient for us to say that we cannot see wherein such language as, "All Wells Shot At The Owner's Risk" printed on the bill-heads and the like, without anything more, and even though known to those dealing with the plaintiff could be construed as a contract by the defendant to relieve the plaintiff from its negligent acts and those of its servants. No cases are called to our attention holding that such would constitute such a contract, nor do we know of any.

The judgment of the court below is reversed and remanded.

*Reversed and remanded.*