RESERVE INSURANCE COMPANY, Appellant,

v.

Joseph Y. GAYLE, Appellee.

No. 11513.

United States Court of Appeals Fourth Circuit.

Argued Dec. 8, 1967.

Decided April 3, 1968.

Aubrey R. Bowles, Jr., Richmond, Va. (Aubrey R. Bowles, III, and Bowles & Boyd, Richmond, Va., on brief), for appellant.

William H. King and Robert A. Drash, Richmond, Va. (McGuire, Woods & Battle, Richmond, Va., on brief), for appellee.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Reserve Insurance Company ("Reserve") sued Joseph Y. Gayle ("Gayle") on two guaranties wherein Gayle guaranteed the remittance by Joseph Y. Gayle, Inc. (now known as Mid-Altantic Underwriters, Incorporated, and hereafter called "Mid-Atlantic") of Reserve's premiums on insurance placed by Mid-Atlantic under the terms and conditions of two agency agreements by and between Reserve and Mid-Atlantic. The district judge submitted to a jury the question of whether Gayle had been released from his guaranties by Reserve in the spring of 1961; and the district judge ruled that if Gayle was released at that time, he had no further liability thereunder because Reserve was subsequently paid all sums due it on the effective date of the release. The jury, on conflicting evidence, found that Gayle was released in the spring of 1961 and judgment was entered for Gayle. Reserve appeals. We conclude that submission of the issue of the release to the jury was proper, that the jury's verdict is unassailable and that, as a matter of law, Reserve was fully paid. As a consequence, we affirm.

The agency agreements were dated July 8, 1959 (effective July 15, 1959) and December 15, 1959, respectively. The July 8, 1959, agreement permitted Mid-Atlantic to write automobile casualty insurance for Reserve on a contingent commission. Mid-Atlantic was not required to remit premiums which it was obliged to collect until 85 days after the last day of the month in which the policies which it wrote became effective. Summarized, the provisions of this agreement required Mid-Atlantic to remit all premiums within the period specified to Reserve. Reserve would deduct therefrom a fixed payment to itself and the cost of reinsuring certain risks and at periodic intervals would return the balance to Mid-Atlantic, less the losses which had been sustained on the risks. Thus, Mid-Atlantic would or would not earn a commission depending upon its loss experience. Additionally, Mid-Atlantic was required, by its deposit of $25,000, to establish a reserve against excessive casualty losses; and if, because of favorable loss experience, the balance of the premiums to be accounted for by Reserve to Mid-Atlantic in a particular accounting period exceeded $22\frac{1}{2}\%$ of the total premiums generated, 75% of the excess was required to be placed in the "Agent's Reserve Trust Fund" as an additional source of funds to meet excessive casualty losses.

The December 15, 1959, agreement required Mid-Atlantic to transmit all premiums due on insurance which it wrote within 45 days after the end of the month in which the insurance was placed. It was entitled to retain 20% of net premiums written and to be remitted to Reserve as its compensation.

Both of the agreements contained a guaranty, executed by Gayle, who, at the time of their execution was the president

of Mid-Atlantic and its principal stockholder, and Richard F. Hull ("Hull"), who was Gayle's son-in-law and business associate. Gayle and Hull "unconditionally at all times guarantee[d] the payment to the Company [Reserve] by the Agent [Mid-Atlantic] of all sums due the Company" under the agreements, and further agreed to hold Reserve harmless "of and from any wrongful acts or conduct of the Agent."

To show the basis of the district judge's submission to the jury of the issue of whether Gayle was subsequently released from his guaranties, additional facts must be stated:

In August, 1960, Gayle sold his interest in Mid-Atlantic to Hull and thereafter ceased active management of Mid-Atlantic. At that time Mid-Atlantic's operations were confined to the District of Columbia and the State of Maryland. Gayle did not sell to Hull Gayle's interest in an agency which was engaged in business in Virginia. On January 23, 1961, Gayle wrote to Reserve's president, Allan S. Blank ("Blank"), advising him of the sale and, *inter alia*, stating in the penultimate paragraph of his letter "as I am no longer financially interested in the D. C. and Maryland companies I would like an acknowledgment that my guarantee for the premiums be withdrawn for business written or [sic] and after February 1st." Blank, because he was away, did not respond immediately, but, by letter dated March 30, 1961, he wrote Gayle "we would be willing to addend Dick's [Hull] contract to show that you are no longer guarantying his premium payments as per the next to last paragraph of your letter."

In another letter, dated April 1, 1961, Gayle again wrote to Blank repeating that what Gayle would like to do was "Amend 9055 and 9056 contracts [Reserve's number designation of the two agency agreements] to relieve me for liability as to written premiums." With a copy sent to Gayle, Blank issued a memorandum to his associates in Reserve outlining Gayle's proposal and asking their opinion thereon. The memorandum stated "We would amend our present contracts on the D. C. and Maryland business effective the first of this coming month, eliminating Joe Gayle's responsibility and guaranty for the payment of premium writings under those agreements." Although all of Blank's associates advised Blank against the release, no evidence was presented to show that their views were communicated to Gayle.

From this date on Gayle and Blank continued to negotiate on a proposal by Gayle that he be given an agency contract for Virginia and on a proposal that Gayle's $25,000 deposit and the Agent's Reserve Trust Fund established under the two earlier agency agreements with Mid-Atlantic be made applicable to Gayle's Virginia agency. Agreement was reached, by memorandum executed May 22, 1961, to be effective June 1, 1961, which constituted the deposit and the Agent's Reserve Trust Fund security for indemnity to Reserve under the two earlier agency agreements and a new agency agreement for Virginia with Joseph Y. Gayle, Inc. (a new corporation), which was also effective June 1, 1961.

According to Gayle, before agreement on this memorandum was reached, Blank telephoned him and advised him that he (Gayle) was released from his premium guaranties and to "forget it." At the trial, Blank, however, testified that after his associates had advised against releasing Gayle, he had telephoned Gayle and told him that he would not be released.

In addition to other writings which we need not particularize, there was also evidence of the subsequent conduct of the parties having probative value on whether Gayle was orally released. It was shown that about the time that Mid-Atlantic's financial difficulties became apparent, Gayle transferred a large portion of his personal assets to his

wife; but Gayle's explanation that he did so because he was concerned over the state of his health was also brought out. It was also shown that without the knowledge or consent of Gayle, Reserve, about September 1, 1961, agreed with Hull to advance working capital to Mid-Atlantic effective retroactively to June 1, 1961, and to alter other terms of the two agency agreements with Mid-Atlantic, and that there was extensive correspondence in regard thereto, copies of which were sent to many interested persons, but not to Gayle.

On these facts, the district judge correctly submitted to the jury the question of whether Gayle was released from his guaranties prior to June 1, 1961, and the jury's determination that Gayle was, is unimpeachable. Admittedly, there was not a formal document of release which could be pointed to. But there was no legal requirement that a release to be effective must be in writing. Certainly, there was ample evidence in the combination of the documents which passed between the parties (as well as those which did not pass), the testimony of Gayle and the subsequent acts of the parties from which the jury could have found that Gayle was released as he contended. The conflict in the testimony of Gayle and Blank made the issue an appropriate one for jury determination, and resolution of that issue, depending as it did so largely on the determination of the credibility of the two principals, was peculiarly one in which the jury's determination was final.

Next, we turn to the question of whether, accepting that Gayle was released prior to June 1, 1961, Gayle's liability under his guaranties was fully met.

Gayle's guaranties were continuing ones and Mid-Atlantic's obligation to remit premiums on policies which it wrote prior to June 1, 1961, continued for a maximum of 85 days after May 31, 1961. Even if we assume that Gayle's obligation under the guaranties continued until all of the premiums on insurance written prior to release of the guaranties were remitted (cf. Mamerow v. National Lead Co., 206 Ill. 626, 69 N.E. 504 (1903)), we think the uncontradicted evidence establishes that all payments that Gayle guaranteed were made.

The record shows that after May 31, 1961, Mid-Atlantic paid sums in excess of all net premiums for which it had been billed by Reserve for policies written in February, March, April and May, 1961, that Reserve accepted such payments and applied them, on its books, as payment for said months under the "First due-First paid" accounting principle. This principle had been followed since the inception of the two agency agreements. There is no dispute between the parties about the correctness of the amounts for each of these months. In aggregate, Reserve claims that it is entitled to recover from Gayle the principal sum of $122,962.96.*

Although not relevant to the damages claimed because Gayle was released in May, 1961, Reserve, in November, 1962, without notice to Gayle, undertook, retroactively to February 5, 1962, to reverse its accounting procedure in accordance with the "Last due-First paid" principle. Indeed, Reserve procured Hull to write two letters in the summer of 1962, dated *March 1, 1962 and March 5, 1962*, respectively, to authorize Reserve to apply payments in inverse order in which policies were written, *even though the effect was to pay some accounts which were not due.*

Leaving aside the question of the business morality of the retroactive reversal of the accounts and the procurement of the two predated letters, which is also not relevant to Reserve's claim for dam-

---

* Reserve arrived at this figure by computing the unremitted premiums as of May 31, 1961 and deducting therefrom Mid-Atlantic's capital and other assets available for payment of the same, exclusive of moneys belonging to Reserve in the possession of Mid-Atlantic.

ages because Gayle was released in May, 1961, Reserve seeks to sustain recovery of $122,962.96 by pointing to the provision, contained in both agency agreements, which states that "All premiums received by the Agency shall be held by such Agent as trustee for the Company until delivered to the Company." It is Reserve's contention that the moneys in the hands of Mid-Atlantic, after May 31, 1961, being trust funds belonging to Reserve derived from insurance placed after Gayle's guaranties were released, could not legally be used by Mid-Atlantic to pay its indebtedness to Reserve for insurance placed prior to May 31, 1961, while Gayle's guaranties were in effect.

■ Reserve's argument, although ingenious, ignores the established principle that once a creditor has applied a payment to an obligation for which a surety or guarantor is bound, the latter is discharged to the extent of the payment, and the creditor may not thereafter alter or modify such application. The principle was recognized by a district court in this Circuit in United States etc., v. Brent, 236 F. 771 (D.S.C. 1916), and it has been more recently applied in Olson Construction Co. v. United States, for Use of Cooper Supply Co., 332 F.2d 981 (10 Cir. 1964), which cited the Brent case with approval. The rule is apparently also recognized and applied in Illinois, where Reserve's home office is situated and where the payments were applied. Halsted v. Griefen, 173 Ill.App. 551 (1912); Miller v. Montgomery, 31 Ill. 350 (1863); Brown v. Haggerty, 26 Ill. 469 (1861). See also, National Surety Co. v. Southern Lumber & Supply Co., 181 Ark. 105, 24 S.W.2d 964 (1930).

■ Denominating the funds from which payment was made as "trust funds" does not remove the case from operation of the principle. The fact is that after May 31, 1961, Mid-Atlantic was indebted to Reserve on two groups of running accounts—net premiums on insurance placed while Gayle was a guarantor and net premiums on insurance placed after Gayle ceased to be a guar-

antor. Gayle guaranteed payment of Reserve's accounts for the former. He did not guarantee payment of the latter and he did not guarantee that the former would be paid solely from collections derived from policies placed while he was a guarantor. The fact that the agency agreements in the first instance permitted deferred payments by Mid-Atlantic, and the further fact that after Gayle ceased to be a guarantor Reserve agreed with Hull to defer some payments even more in order to provide additional working capital for Mid-Atlantic show that Reserve was interested in payment, and not the source from which funds were derived for payment. Having applied Mid-Atlantic's post-May 31, 1961 payments in full discharge of Mid-Atlantic's pre-May 31, 1961 liabilities, Gayle's obligations were released and Reserve may not now take a contrary position.

Similarly, Reserve may not bolster its argument by invoking the provision of the agency agreements that "[T]he keeping of an account on the books of the Company * * * is hereby declared to be a record of memorandum of business transacted * * *" and the further provision that "[E]rrors may occur in connection with accounting between the parties. Accounts should be revised upon discovery of such errors * * *." Manifestly, the latter provision, as it states by its terms, relates to "calculations of return premium, calculations of earned premium and establishment * * of reserves for losses and loss expense * * *," in short, mathematical errors and errors by Reserve in the exercise of its discretion to establish certain reserves. The differences between the parties are not of this nature; they boil down to whether, having applied payment to the accounts which Gayle guaranteed, Reserve may still hold Gayle liable thereon. We think not. Whether these provisions would render the Illinois doctrine of account stated inapplicable, we need not decide. See, State v. Illinois Cent. R. Co., 246 Ill. 188, 92 N.E. 814; Dick v. Zimmerman, 207 Ill. 636, 69 N.E.

754 (1904); Pure Torpedo Corp. v. Nation, 327 Ill.App. 28, 63 N.E.2d 600 (1945); Dean & Son v. W. B. Conkey Co., 180 Ill.App. 162 (1913). Nor do we need to resort to that doctrine to support our decision.

Affirmed.

