CHICAGO & EASTERN ILLINOIS RAILROAD COMPANY, Plaintiff and
Counterdefendant-Appellee and Cross-Appellant, *v.* THE MARTIN
BROTHERS CONTAINER & TIMBER PRODUCTS CORPORATION,
Defendant and Counterplaintiff-Appellant and Cross-Appellee.

First District (2nd Division)   No. 79-953

Opinion filed July 29, 1980.

James L. Garthright, Jr., and James L. Garthright, III, both of Garthright & Garthright, of Memphis, Tennessee, and Leonard Nelson, of Price, Schoenberg, Fisher & Newman, Ltd., of Chicago, for appellant.

J. H. Durkin, of Chicago, for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

This action was brought upon accounts stated by the Chicago & Eastern Illinois Railroad (Railroad)[1] against a manufacturer, Martin Brothers Container & Timber Products Corporation (Martin), for carrier services rendered in shipping Martin's products from its facilities near Karnak, Illinois. The accounts consisted of $27,000 in unpaid demurrage charges which accrued from April 1, 1972, until March 31, 1974. Martin raised an affirmative defense of "carrier error," and filed a counterclaim alleging that from April 2, 1973, until December 9, 1974, the Railroad failed to timely deliver and remove railway cars resulting in damage to Martin. Prior to trial, and before a different judge, the Railroad moved to dismiss Martin's affirmative defense and counterclaimed on the ground that those issues were within the primary jurisdiction of the Interstate Commerce Commission and should not be resolved by a judicial tribunal. The motion was denied. Sitting without a jury, the trial court found the issues for the Railroad and entered judgment for $34,423.04, constituting damages plus $7,423.04 in prejudgment interest. The trial court also entered judgment for the Railroad on Martin's counterclaim.

Martin appeals from these judgments, raising as issues on appeal whether error was committed in denying presentation of the affirmative defense of "carrier error"; the finding that accounts stated existed was against the manifest weight of the evidence; prejudgment interest was properly awarded; and, a certain exhibit was properly excluded as hearsay from the trial court's consideration. The Railroad cross-appeals from the denial of its motion to dismiss the affirmative defense and counterclaim for lack of subject matter jurisdiction, which it asks to be considered only if all other issues are found in Martin's favor.

The Railroad's evidence revealed that for shipping services rendered

---

[1] The Railroad subsequently merged with Missouri Pacific Railroad which was substituted as party plaintiff in the case. The case caption was not amended, however.

it transmitted 24 demurrage bills to Martin during the relevant period. These bills were based upon monthly debits incurred by Martin for retaining railroad cars at plant site in excess of the 48-hour "free time" period over and above the number of credits accrued by Martin for early release of the Railroad's cars under an "average agreement" authorized by Rule 9 of the Freight Tariff 4—I approved and issued by the Interstate Commerce Commission.[2] Changes were made on March 29, 1974, to 11 of the 24 bills, consisting of deletions and insertions of certain computations in consonance with a new carrier tariff overlooked in later billings. No objection was communicated by Martin to the Railroad with respect to the demurrage bills, and no protest concerning the bills was ever registered until the litigation commenced in February of 1975, according to the Railroad. Follow-up "tracers" covering all demurrage bills issued were also sent by the carrier. The follow-up system was computerized, and the bills went out on a statement with a new tracer every 10 days. Four such tracers were sent by the Railroad to Martin for each of the 24 bills. The Interstate Commerce Commission had issued credit regulations (49 C.F.R. §1320.7 (1972)) authorizing carriers to extend credit on accrued demurrage charges for a period of no more than 15 days from the date of the presentation of the bills. Because Martin failed to object to the demurrage bills and tracers within the 15-day period or at any other time after its bills had been rendered, the Railroad maintains that each bill became an account stated and all possible defenses to the bills were thereby waived, relying upon *Leather Manufacturers' National Bank v. Morgan* (1886), 117 U.S. 96, 29 L. Ed. 811, 6 S. Ct. 657; *State v. Illinois Central R.R. Co.* (1910), 246 Ill. 188, 92 N.E. 814; *Pure Torpedo Corp. v. Nation* (1945), 327 Ill. App. 28, 63 N.E.2d 600; and *Soft Water Service, Inc. v. M. Suson Enterprises, Inc.* (1976), 39 Ill. App. 3d 1035, 351 N.E.2d 264.

■■ Martin's evidence of record[3] does not contradict the assertion that it had failed to object to the demurrage bills and tracers. Its vice president testified that the Railroad's demurrage bills were simply filed in Martin's office unpaid and that although they were not audited by the shipper, he was sure they were correct. The chief basis for failure to pay the bills was Martin's belief that it had the right to assert affirmative defenses to the

---

[2] These debits are referred to as "demurrage," which include two distinct elements, namely, the compensation for the use of a car and a penalty to encourage prompt return of the car to public service. *Ormet Corp. v. Illinois Central R.R. Co.* (1972), 341 I.C.C. 647, 650.

[3] Martin alludes to a letter of objection to the March 1974 amendments, allegedly sent by it to the carrier in June of 1974, which admittedly was not presented at trial or made part of the record. Such evidence, of course, cannot be considered here. *Cato v. Thompson* (1980), 83 Ill. App. 3d 321, 325, 403 N.E.2d 1239.

account stated, particularly the defense of "carrier error."[4] Carrier error was committed in this case, according to Martin, because the Railroad allegedly advised it to order rail cars in advance of its need and to designate delivery of cars to be made "as soon as possible." No person at the Railroad giving that advice, nor the time when such advice was given, was specifically identified; it was generally "insinuated." When the cars were so ordered, they arrived in "bunches" and because the shipper's facilities could not load the cars fast enough some were detained beyond the "free time" which would have precluded demurrage charges. No cars delivered by the Railroad were ever refused by Martin, however, on the ground that it had too many on hand. When Martin had extra cars at one facility, it would ask the Railroad to move them somewhere else on the premises. During the relevant period, Martin also ordered and received from 10 to 20 percent of its cars from Penn Central Railroad.

■■ ■ The elements of an account stated were explicated at length recently in *Motive Parts Co. of America, Inc. v. Robinson* (1977), 53 Ill. App. 3d 935, 369 N.E.2d 119, a case cited and relied upon by both parties. The establishment of an account stated is warranted under circumstances where, as in the case before us, a statement of account has been rendered by one party to another and is retained by the latter beyond a reasonable time without objection, thereby constituting an acknowledgment and recognition of the correctness of the account. Since an account stated raises a new cause of action between the parties, matters of anterior liability which are pertinent to a cause of action upon the original contract, such as lack or failure of consideration, may not be raised as defenses because the action is founded upon the promise to pay the balance ascertained and not upon the original contract. Exceptions to this rule are recognized in instances of fraud, error or mistake. (*Motive Parts Co. of America, Inc. v. Robinson* (1977), 53 Ill. App. 3d 935, 940-41, and cases therein cited.) The trial court in the case *sub judice* therefore correctly found that Martin's failure to object to demurrage bills by notifying the Railroad within a reasonable time of its disagreement created the accounts stated and precluded consideration of anterior matters raised by Martin's affirmative defense.

Martin contends that Federal law requires the presentation of carrier error as a defense, if applicable, in a suit by a carrier under an account stated theory and that any refusal to allow this defense is in violation of the supremacy clause, Interstate Commerce Commission rules and decisions, and Federal and State cases. Our examination of Rule 8, section B of the Uniform Demurrage Code upon which Martin relies reveals little

---

[4] Carrier error is recognized as a defense in certain actions having the effect of reducing or eliminating a shipper's liability for demurrage charges accrued through the fault of a carrier or where demurrage charges are unjust. *Ormet Corp. v. Illinois Central R.R. Co.* (1972), 341 I.C.C. 647.

support for its position under the facts of this case, however. There, although "bunching" of which Martin complains is disapproved, the rule requires that a shipper's claims are "* * * to be presented to the railroad company's agent within fifteen (15) days," which Martin failed to observe. Further, extension of credit beyond the 15-day period imposed by the Interstate Commerce Commission in its credit regulations (49 C.F.R. 1320.7 (1972)) would result in equal guilt of both the railroad and the shipper (*Hocking Valley Ry. Co. v. United States* (6th Cir. 1914), 210 F. 735, *cert. denied* (1914), 234 U.S. 757, 58 L. Ed. 1579, 34 S. Ct. 675; *United States v. Sunday Creek Co.* (N.D. Ohio 1911), 194 F. 252, *aff'd* (6th Cir. 1914), 210 F. 747, *cert. denied* (1914), 234 U.S. 757, 58 L. Ed. 1579, 34 S. Ct. 675; *cf. Continental Shipper's Association, Inc. v. United States* (9th Cir. 1964), 328 F.2d 966, 969) and would be of no assistance to Martin.

The cases relied upon by Martin, *Ormet Corp. v. Illinois Central R.R. Co.* (1972), 341 I.C.C. 647; *C.H. Sprague & Son Co. v. Pennsylvania R.R. Co.* (1955), 294 I.C.C. 723; *Senaca Coal & Iron Corp. v. Southern Ry. Co.* (1955), 297 I.C.C. 119; and *Illinois Central R.R. Co. v. Matthews Transfer Co.* (1971), 132 Ill. App. 2d 1084, 270 N.E.2d 47, also fall short of the mark. In none of them did the shipper completely ignore the demurrage bills as in this case, and in none of them was the law relating to accounts stated pursued as a theory of recovery. No case cited by Martin holds that the law relevant to accounts stated is in conflict with the Interstate Commerce Commission Act. We note in passing that such theory of recovery is recognized and applied not only by State courts but by Federal courts as well. *Leather Manufacturers' National Bank v. Morgan* (1886), 117 U.S. 96, 29 L. Ed. 811, 6 S. Ct. 657; *Willard Helburn, Inc. v. Spiewak* (2d Cir. 1950), 180 F.2d 480, 483; *Luckenbach Steamship Co. v. United States* (S.D.N.Y. 1960), 189 F. Supp. 309; *United States ex rel. Pool Construction Co. v. Smith Road Construction Co.* (N.D. Okla. 1964), 227 F. Supp. 315.

Martin urges that the evidence fails to support a finding of accounts stated in this case because the charges originally submitted to it were subsequently amended on March 29, 1974, and that it denied liability for the assessed charges as, corrected in a letter heretofore referred to in footnote 3 which, as we have said, was never submitted in evidence, nor made part of the record and cannot be considered here. Relying upon *Pure Torpedo Corp. v. Nation* (1945), 327 Ill. App. 28, 33, 63 N.E.2d 600, Martin suggests that its objection to the accounts stated were made within a reasonable period of time from the receipt thereof which excludes any presumption as to the correctness of the accounts and precludes new causes of action from being generated under the doctrine. What will constitute a reasonable time within which to make the objection depends

upon the circumstances of each case, the ordinary course of business and the relationship of the parties with no general rule controlling. *State v. Illinois Central R.R. Co.* (1910), 246 Ill. 188, 246, 92 N.E. 814.

Certain corrections in the form of minor deletions and insertions in 11 of the previously stated 24 accounts were made by the Railroad to reflect a change in tariff charges which became effective in March of 1973 and had been overlooked in subsequent billing. As held in *Pickham v. Illinois, Iowa & Minnesota Ry. Co.* (1910), 153 Ill. App. 281, 297, however, "an account stated is none the less an account stated because of an omission by mistake." Assuming that the time to be measured is from the rendering of the corrected accounts, nevertheless the result remains the same, since Martin's delay in protesting the amended billings also exceeded the time provided in the Commission's rules governing the filing of objections to charges, whether we were to consider either the alleged letter of protest or the response to litigation as Martin's first objection to the charges. We cannot say that in recognizing accounts stated in the instant case the trial court abused its discretion in considering the passage of time from the date of rendering both the accounts and the amended accounts to the time objection was made by Martin, in either situation, as an unreasonable delay on Martin's part. For the same reasons, we are constrained to reject Martin's further contention that no liability arose under the theory of account stated, because it had no liability for the demurrage charges to begin with, citing *Motive Parts Co. of America v. Robinson,* and *Conley v. National House Furnishing Co.* (1937), 292 Ill. App. 558, 562, 11 N.E.2d 828. We agree with the principle stated in those authorities; it simply does not apply to these facts.

Martin next identifies error in the trial court's granting of prejudgment interest. It recognizes that such interest may be awarded absent a contract where the amount owed a creditor by a debtor is fixed or determinable and due as held in *Kansas Quality Construction, Inc. v. Chiasson* (1969), 112 Ill. App. 2d 277, 250 N.E.2d 785, but asserts that the demurrage charges made in the case before us were reaudited and corrected, and therefore could not have been fixed or determinable until March 29, 1974. Further, Martin argues, the charges were neither liquidated nor subject to easy computation as required by section 2 of the Illinois interest statute (Ill. Rev. Stat. 1977, ch. 74, par. 2), and *John Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 339 N.E.2d 529. Under the evidence produced, however, the accounts stated in 13 of the bills rendered were not amended from the dates of their rendition nor objected to within a reasonable time by Martin and were thus clearly determinable, due and liquidated. As to the 11 bills recomputed on March 29, 1974, however, interest should not have been allowed from the dates on which they were rendered but from the

amendment date, when they also became liquidated and due. This was error and the cause must be remanded for submission and consideration of appropriate computations by the parties.

Also in regard to prejudgment interest, Martin claims that because it withheld payment in good faith by virtue of a genuine and reasonable dispute, no such interest should have been awarded, citing *Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377, 226 N.E.2d 270. Little evidentiary support is found in the record for this contention. Martin relies upon testimony of its witness that he "believed on occasions" he talked to a Railroad employee about demurrage or bunched up cars about which nothing was done by the Railroad because of Interstate Commerce Commission regulations. Such testimony presents little evidence of any protest of demurrage billings which would demonstrate the existence of a good-faith dispute, and the trial court was entitled to give it little weight. In any event, even were we to assume that the evidence was sufficient, the fact that parties may reasonably differ as to their liability does not preclude an award of interest under the statute. *Haas v. Cravatta* (1979), 71 Ill. App. 3d 325, 330-32, 389 N.E.2d 226; *Madison Park Bank v. Field* (1978), 64 Ill. App. 3d 838, 381 N.E.2d 1030; *Central National Chicago Corp. v. Lumbermens Mutual Casualty Co.* (1977), 45 Ill. App. 3d 401, 359 N.E.2d 797.

We next examine the Railroad's contention in its cross-appeal that Martin's affirmative defense and counterclaim were properly within the primary jurisdiction of the Interstate Commerce Commission and that it was error for the trial court to deny its motion to dismiss those issues for want of jurisdiction.[5] Although the Railroad suggests that we treat this issue only if all other issues are found in Martin's favor, we see "* * * no escape from the conclusion that the grievances complained of were primarily within the administrative competency of the Interstate Commerce Commission and not subject to be judicially enforced * * *" (*Baltimore & Ohio R.R. Co. v. United States ex rel. Pitcairn Coal Co.* (1910), 215 U.S. 481, 493, 54 L. Ed. 292, 297, 30 S. Ct. 164, 169, and see *United States v. Western Pacific R.R.* (1956), 352 U.S. 59, 63-64, 1 L. Ed. 2d 126, 132, 77 S. Ct. 161, 165), for the reasons that follow and accordingly decide this question before reaching a determination of "all other issues."

The Railroad maintains that the affirmative defense and counterclaim are both concerned with the reasonableness of the Railroad's methods and practices in furnishing freight car service to Martin during the relevant time period. We have already considered the viability of Martin's

---

[5] The motion, contained in both the Railroad's response to Martin's affirmative defense and counterclaim, and repeated in a separate motion later presented, was ruled upon prior to trial by a judge other than the judge before whom the case was tried on its merits, as earlier noted.

affirmative defense earlier and note here that our views as to jurisdiction of the counterclaim would apply equally to the affirmative defense. Pointing to Service Order No. 1124 promulgated by the Commission, the Railroad notes that the order regulates demurrage charges and rules relating thereto during a declared national railway car shortage emergency. That order, appearing in the Federal Register of March 13, 1978 (38 Fed. Reg. 6828), declared in its preamble that an acute shortage of boxcars, gondola cars and covered hopper cars existed throughout the country, resulting in the inability of certain carriers to furnish adequate numbers of those types of cars to shippers located on their lines, thereby impeding movement of many commodities. The order further found that many shippers had been holding freight cars for excessive periods of time awaiting loading, unloading or disposition instructions, thus immobilizing large numbers of freight cars, a practice which existing demurrage and detention rules were ineffective to control. The situation was described as an emergency necessitating immediate action by the Commission which it set forth in regulatory provisions in successive paragraphs. For a two-week period, from March 16 to March 31, 1973, the order cancelled the type of "average agreement" provision for which the Railroad and Martin had contracted; however, this type of agreement was reinstated on April 1, 1973, permitting increased demurrage and retention charges. The service order, with its emergency shortage findings, was readopted from time to time ultimately remaining in effect until October 1, 1974.[6]

The doctrine of primary jurisdiction invoked by the Railroad has been applied by the United States Supreme Court whenever enforcement of a claim otherwise cognizable in a court of law requires the resolution of issues within the special competence of an administrative body as provided by statute. (*United States v. Western Pacific R.R. Co.* (1956), 352 U.S. 59, 63-64, 1 L. Ed. 2d 126, 132, 77 S. Ct. 161, 165.) The exercise of this doctrine follows no fixed formula; in each case the issue is whether the underlying reasons for the doctrine exist and whether its purposes will be aided by its being employed in such case. (352 U.S. 59, 64, 1 L. Ed. 2d 126, 132, 77 S. Ct. 161, 165.) Although desirable uniformity in administrative decisions was first emphasized as a reason for its application, adherence to the doctrine in order to utilize the expert and specialized knowledge of the agency in cases raising issues of fact not within the conventional experience of judges has been more recently stressed by the Supreme Court. 352 U.S. 59, 64, 1 L. Ed. 2d 126, 132, 77 S. Ct. 161, 165; *Far East Conference v. United States* (1952), 342 U.S. 570, 574-75, 96 L. Ed. 576, 582-83, 72 S. Ct. 492, 494.

---

[6] 38 Fed. Reg. 8446 (1973); 38 Fed. Reg. 9230 (1973), 38 Fed. Reg. 18251 (1973); 38 Fed. Reg. 18465 (1973); 38 Fed. Reg. 26805 (1973); 39 Fed. Reg. 7792 (1974); 39 Fed. Reg. 24508 (1974).

Application of the doctrine is urged by the Railroad in this case because Martin's counterclaim questions the Railroad's methods and practices in its delivery to and withdrawal of railroad cars from Martin's premises during a time of a national railway car shortage emergency which it claims is peculiarly within the administrative competence of the Commission, relying principally upon *Midland Valley R.R. Co. v. Barkley* (1928), 276 U.S. 482, 72 L. Ed. 664, 48 S. Ct. 342. In *Midland*, a mining company sought and was awarded damages by a State trial court, affirmed by the State supreme court, against a railroad which it claimed had failed to furnish a certain type of freight car necessary to the mining operations as part of the railroad service to the mine. The railroad objected to the maintenance of the action in the State court on the ground, as asserted in the present case, that proper distribution of cars during a time of car shortage, which then existed, was a question which Congress had committed to the Interstate Commerce Commission. The shipper contended there, as Martin does here, that it had the right to bring action against the railroad by virtue of section 22 of the Interstate Commerce Act[7] and that the shipper was not attacking any order or regulation of the Commission relating to car distribution, relying upon *Pennsylvania R.R. Co. v. Puritan Coal Mining Co.* (1915), 237 U.S. 121, 59 L. Ed. 867, 35 S. Ct. 484, and *Pennsylvania R.R. Co. v. Sonman Shaft Coal Co.* (1916), 242 U.S. 120, 61 L. Ed. 188, 37 S. Ct. 46, upon which Martin also places reliance.

The Supreme Court in *Midland* rejected the shipper's assertion that no administrative question was involved, noting that the issue of reasonableness in the railroad's distribution of cars was the substantial matter in controversy which, in times of a car shortage, was one clearly calling for the exercise of the Commission's regulatory function. Distinguishing *Puritan*, the Supreme Court observed that there a charge of discrimination was being made, which was a judicial rather than an administrative issue, and that in *Sonman* the action was for failure to supply cars in confessedly normal times as opposed to the emergency situation presented in *Midland*. The Railroad correctly asserts that other cases cited and relied upon, *Morrisdale Coal Co. v. Pennsylvania R.R. Co.* (1913), 230 U.S. 304, 57 L. Ed. 1494, 33 S. Ct. 938, to which we will later refer, *Baltimore & Ohio R.R. v. United States ex rel. Pitcairn Coal Co.* (1910), 215 U.S. 481, 54 L. Ed. 292, 30 S. Ct. 164, and *Spence v. Baltimore & Ohio R.R. Co.* (7th Cir. 1966), 360 F. 2d 887, are each similarly concerned with the railroad's distribution of cars to shippers in times of car shortages, each holding that the grievances complained of were primarily within the administrative competence of the Commission rather than the court.

---

[7] Now 49 U.S.C. §10103 (1978).

Opposition by Martin to the application of the primary jurisdiction doctrine to its affirmative defense and counterclaim is based, in part, on its reading of *Swift & Co. v. Hocking Valley Ry. Co.* (1917), 243 U.S. 281, 61 L. Ed. 722, 37 S. Ct. 287, *Pennsylvania R.R. Co. v. Kittaning Iron & Steel Manufacturing Co.* (1920), 253 U.S. 319, 64 L. Ed. 928, 40 S. Ct. 532, and *Illinois Central R.R. Co. v. Matthews Transfer Co.* (1971), 132 Ill. App. 2d 1084, 270 N.E.2d 471. In *Swift*, the issue presented was whether the trackage involved was privately or railroad owned; *Kittaning* considered demurrage liability in contemplation of the necessity of thawing ore which had been frozen in transit prior to its being unloaded; and *Matthews* decided the question of privately owned vis-a-vis railroad owned trackage in determining demurrage liability. More importantly, neither *Swift*, nor *Kittaning*, nor *Matthews* was decided within a setting of a national car shortage emergency. Martin invites our attention to *Illinois Central R.R. Co. v. Mulberry Hill Coal Co.* (1915), 238 U.S. 275, 59 L. Ed. 1306, 35 S. Ct. 760, and *Baltimore & Ohio R.R. Co. v. Brady* (1933), 288 U.S. 448, 77 L. Ed. 888, 53 S. Ct. 441, in support of its position because in each, as in this case, damages were sought and awarded in actions which originated before judicial tribunals based upon the failure of the carrier to furnish car service at the shipper's facilities. No administrative rule was challenged as to its reasonableness or validity, and a car shortage existed in each case; nevertheless, Martin contends, the Supreme Court sustained the court proceedings in each.

■■ A closer reading of *Mulberry Hill* reveals, however, that no national car shortage emergency was there declared by the Commission; rather, the evidence revealed only a shortage of cars on the Illinois Central Railroad lines, the reason for which was not shown to the court, which patently and significantly distinguishes the instant circumstances from those existing in *Mulberry Hill.* In *Brady*, the action brought in the Federal district court was based upon the railroad's failure to comply with a reparation order of the Commission, before which relief was first sought, and the shipper pursued damages in excess of the award in the Federal district court. The Supreme Court in *Brady* explained that questions of reasonableness of rules, regulations and practices governing the distribution of railroad cars in periods of car shortage are for the Commission, citing with approval *Morrisdale Coal Co. v. Pennsylvania R.R. Co.* (1913), 230 U.S. 304, 57 L. Ed. 1494, 33 S. Ct. 938. (288 U.S. 448, 456-57, 77 L. Ed. 888, 892, 53 S. Ct. 441, 442-43.) *Morrisdale*, a case relied upon by the Railroad in the instant case as earlier noted in this opinion, held that the proper method of distribution of cars during a period of shortage and the validity of particular railroad practices during such periods call for the exercise of the powers and discretion conferred by Congress on the Commission. (230 U.S. 304, 313, 57 L. Ed. 1494, 1497-98,

33 S. Ct. 938, 941.) Accordingly, *Brady*, standing with *Morrisdale*, supports the conclusion that Martin's affirmative defense and counterclaim should have been dismissed for want of jurisdiction. Other authorities cited by Martin have been carefully examined, are factually inapposite and do not compel a contrary conclusion.

Citing provisions of the Hepburn Act of 1906 as amended (49 U.S.C. §1(4) (1906), amended, 49 U.S.C. §10701 *et seq.* (1978)), as well as provisions of the Illinois commerce commission act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 52) and "An Act in relation to fencing and operating railroads (Ill. Rev. Stat. 1977, ch. 114, par. 77), Martin seeks to demonstrate that the Illinois courts are vested with jurisdiction to hear and determine the issues presented in its affirmative defense and counterclaim. Analysis of those provisions reveals no instance in which the peculiar circumstances of a national car shortage emergency are treated within the ambit of their concern.

In consideration of the acute car shortage declared by the Interstate Commerce Commission in its Service Order No. 1124 in the instant case, we are of the opinion that primary jurisdiction under these facts resided in the Interstate Commerce Commission because of its expert and specialized knowledge of the facts underlying the acute national car shortage which it declared and emergency conditions it found in its Service Order No. 1124. Significantly, this order was in effect from March 16, 1973, to October 1, 1974, a period substantially coinciding with the time within which Martin's grievances over the Railroad's practices were identified in its affirmative defense and counterclaim. Whether or not bunching of cars or directing the ordering of cars to be delivered as soon as possible in advance of need or failure to timely remove cars from the plant premises, were reasonable Railroad practices in the milieu of car shortage and emergency conditions were issues primarily within the administrative competence of the Commission, not the court. (*Midland Valley R.R. v. Barkley*; *Morrisdale Coal Co. v. Pennsylvania R.R.*; *Baltimore & Ohio R.R. v. United States ex rel. Pitcairn Coal Co.*; *Spence v. Baltimore & Ohio R.R. Co.*) It was error, therefore, to deny the Railroad's motion to dismiss Martin's affirmative defense and counterclaim. All substantive findings by the trial court with respect to this issue must be reversed.

In this posture of the case it is unnecessary to consider any of the substantive evidentiary questions raised with respect to Martin's affirmative defense and counterclaim in light of our disposition of the aforesaid jurisdictional question.

For the foregoing reasons we affirm the judgment of the trial court awarding damages to the Railroad upon the accounts stated and the prejudgment interest computed with respect to the 13 accounts submitted

prior to March 29, 1974. We reverse the prejudgment interest awarded with respect to the accounts stated amended on that date and remand to the trial court for further computations. We reverse the finding of jurisdiction with respect to the affirmative defense and counterclaim.

Affirmed in part and reversed in part and remanded.

PERLIN, P. J., and STAMOS, J., concur.